JOHN DOWD AND HELEN DOWD, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 4081–74.   Filed May 31, 1977.

*Richard V. D'Alessandro* and *E. Michael DiFabio,* for the petitioners.
*Richard S. Kestenbaum,* for the respondent.

GOFFE, *Judge:* The Commissioner determined a deficiency in petitioners' Federal income tax for the taxable year 1969 in the amount of $48,625.97. The issue remaining for decision is whether petitioners may deduct $69,908.67 paid to trade creditors and $7,532.27, the expense of litigation relating thereto, as either ordinary and necessary business expenses or expenses incurred for the production of income.

### FINDINGS OF FACT

Some of the facts have been stipulated. The stipulation of facts, supplemental stipulation of facts, and the attached exhibits are incorporated by this reference.

Petitioners John and Helen Dowd, husband and wife, who resided in Saratoga Springs, N. Y., at the time of filing their petition herein, filed a joint Federal income tax return for the taxable year 1969 with the Internal Revenue Service, Andover, Mass. Throughout the period under consideration, petitioners computed taxable income for Federal income tax purposes under the cash method of accounting.

Through November 1963, petitioner John Dowd (hereinafter petitioner) was a coin and currency broker actively engaged in the business of buying, selling, exchanging, and transporting coin and currency primarily in extreme northeastern United States and eastern Canada. Canadian coin and currency would be obtained in New York and transported to Canada, Montreal in most cases, and exchanged for United States coin and currency. United States currency was delivered to banks in small towns in the northeastern United States. This service was particularly valuable to smaller banks whose currency deliveries from correspondent banks in Boston were burdensome due to inconvenience in transportation and the unwillingness of the U.S. Postal Service to handle coin for large Boston banks. In a typical transaction petitioner would supply the bank with his coin and currency in amounts dependent on the needs of the particular bank. In exchange petitioner would take Canadian coin and currency, British pounds, or larger denomination

U.S. bills; if the coin and currency received by petitioner exceeded that which he delivered to the bank, petitioner would pay this difference by check which, in most cases, was drawn on the Security National Bank of Cleveland, Ohio. Thus, there are innumerable combinations of exchanges, but, in each case, a substantial part of the transaction consisted of petitioner's purchase, by check, of coin and currency, whether U.S. or Canadian.

Checks issued by petitioner or his employees for the purchase of coin and currency bore petitioner's signature; in most cases petitioner's employees used a facsimile stamp acceptable by the banks upon which the checks were drawn.

During the month of November 1963, petitioner and his employees purchased, by check, coin and currency exceeding $475,000. On November 13, 1963, Security National Bank of Cleveland, petitioner's principal source of credit and the bank upon which most of the checks for coin and currency had been drawn, notified petitioner that it would no longer permit petitioner's account to be overdrawn and it would no longer extend any additional credit to him. Petitioner, upon advice of counsel, issued a stop payment order to each bank against which a check was then outstanding for purchases of coin and currency. Thereafter, on November 26, 1963, petitioner filed a voluntary petition in bankruptcy in the United States District Court for the Northern District of New York and was adjudicated a bankrupt.

During the course of the bankruptcy proceedings, unsecured creditors filed proofs of claim with the bankruptcy court and each was paid an amount equal to 40 percent of his claim. Thereafter, on March 29, 1968, the trustee in bankruptcy, Edgar Blumberg, filed objections opposing petitioner's discharge in bankruptcy on the grounds that the records maintained by petitioner in his business were inadequate to trace the flow of currency in and out of the business and as a result over $200,000 in cash and currency could not be located.

Subsequently, petitioner through his attorneys in New York, Weil, Gotshal & Manges, contacted the trustee's attorney, Donald T. Hatt, and offered to pay creditors a dividend on their respective claims of 5 percent from funds to be obtained outside the bankruptcy estate. The offer was

subject to the condition that they would not object to the discharge of the bankrupt. Although this offer was acceptable to the creditors committee, it was withdrawn and a new offer was substituted on May 29, 1969. The terms of the second offer were substantially the same as the first; however, the dividend percentage was increased from 5 percent to 15 percent and, in addition, the payment to the creditors would constitute a waiver of any claims they might have against petitioner. Administration expenses connected with the 15-percent payment would also be paid. These sums would not be turned over to the trustee in bankruptcy or become assets of the bankruptcy estate but would, instead, be paid directly to the creditors. This offer was submitted to the creditors and accepted by them. In view of petitioner's offer, the trustee withdrew his objections to petitioner's discharge in bankruptcy and filed with the referee a petition recommending acceptance of petitioner's offer to make a 15-percent dividend payment directly to his creditors. In May 1969, the referee in bankruptcy issued an order to show cause why petitioner's 15-percent offer should not be accepted. On June 16, 1969, upon notice to all creditors, the bankruptcy court directed that the 15-percent dividend and the administration expenses connected therewith be paid. The 15-percent payment of claims approved by the bankruptcy court were made as follows:

| Creditor or its assign | Total debt | Debt for coin and currency | Amount paid | Payment for coin and currency at 15% of debt |
|---|---|---|---|---|
| Barre Trust Co. | $13,811.05 | $13,811.05 | $2,071.66 | $2,071.66 |
| Caledonia National Bank | 2,500.00 | 2,500.00 | 375.00 | 375.00 |
| Canadian Imperial Bank of Commerce | 42,222.99 | ¹35,416.62 | 6,333.45 | 5,312.49 |
| The Fidelity & Casualty Co. of New York | 7,791.47 | 7,791.47 | 1,168.72 | 1,168.72 |
| Citizens Savings Bank & Trust Co. | 2,094.00 | 2,094.00 | 314.10 | 314.10 |
| Aetna Life & Casualty Co. | 4,670.15 | 4,670.15 | 700.52 | 700.52 |
| Glens Falls National Bank & Trust Co. | 12,641.31 | 12,641.31 | 1,896.20 | 1,896.20 |
| Mrs. Howard Gould | 394.53 | 394.53 | 59.18 | 59.18 |
| American Fidelity Co. | 2,716.64 | 2,716.64 | 407.50 | 407.50 |
| Fidelity & Deposit Co. of Maryland | 4,074.13 | 4,074.13 | 611.12 | 611.12 |
| Lyndonville Savings Bank & Trust Co. | 4,000.00 | 4,000.00 | 600.00 | 600.00 |
| Merchants National Bank | 261.73 | 0 | 39.26 | 0 |
| Montreal City & District Savings Bank | 40,803.79 | 40,803.79 | 6,120.57 | 6,120.57 |
| Bank of Montreal | 55,059.74 | 22,337.28 | 8,258.96 | 3,350.59 |
| Bank of London and Montreal | 13,768.21 | 13,768.21 | 2,065.23 | 2,065.23 |
| Fidelity & Deposit Co. of Maryland | 21,021.31 | 21,021.31 | 3,153.20 | 3,153.20 |

| | | | |
|---|---|---|---|
| Bank of Nova Scotia | 60,614.71 | 60,614.71 | 9,092.21 | 9,092.21 |
| Quebec Savings Bank | 62,006.60 | 62,006.60 | 9,300.99 | 9,300.99 |
| Royal Bank of Canada | 47,487.76 | ¹38,271.19 | 7,123.16 | 5,740.67 |
| Lumberman's Mutual Casualty Co. | 980.50 | 980.50 | 147.08 | 147.08 |
| Hartford Accident & Indemnity Co. | 11,528.69 | 11,528.69 | 1,729.30 | 1,729.30 |
| The White Mountain Trust Co. | 792.33 | 792.33 | 118.85 | 118.85 |
| The County Trust Co. | 4,612.50 | 4,612.50 | 691.88 | 691.88 |
| North Conway Loan & Banking Co. | 5,002.00 | 5,002.00 | 750.30 | 750.30 |
| Hartford Accident & Indemnity Co. | 7,466.59 | 7,466.59 | 1,119.99 | 1,119.99 |
| Lionel, Perera, Manfra & Brookes, Inc. | 19,446.41 | 19,446.41 | 2,916.96 | 2,916.96 |
| The Fidelity & Casualty Co. of New York | 3,176.80 | 3,176.80 | 476.52 | 476.52 |
| Transamerica Ins. Co. | 7,121.80 | 7,121.80 | 1,068.27 | 1,068.27 |
| Skowhegan Savings Bank | 4,501.65 | 4,501.65 | 675.25 | 675.25 |
| Amoskeag National Bank of Manchester | 1.65 | 1.65 | .25 | .25 |
| Casco Bank & Trust Co. | 3,486.61 | 3,486.61 | 522.99 | 522.99 |
| Totals | 466,057.65 | 417,050.52 | 69,908.67 | 62,557.59 |

¹Adjusted for set off.

The Canadian Imperial Bank of Commerce (Commerce) asserted a claim against petitioner in the amount of $42,558.49 less a setoff of $336.50 or a net claim of $42,221.99. Of this amount, $6,858.25 represented loans connected with petitioner's business activities and not the purchases of coin and currency and $35,416.62 represented the purchase of coin and currency. Of the $6,333.45 paid to Commerce in 1969 only $5,312.49 was attributable to petitioner's purchase of coin and currency and $1,020.96 was attributable to the repayment of bank loans.

The Merchants National Bank of Burlington (Merchants Bank) asserted a claim against petitioner in the amount of $261.73. No part of this amount was attributable to the purchase of coin and currency from the Merchants Bank.

The Bank of Montreal (Montreal Bank) asserted claims against petitioner in the aggregate amount of $55,059.74. However, $32,722.46 was not attributable to the purchase of coin and currency but rather to loans. Thus, of the $8,258.96 payment made to Montreal Bank in 1969, only $3,350.59 was attributable to the purchase of coin and currency.

The Royal Bank of Canada (Canada Bank) asserted claims against petitioner in the aggregate amount of $49,672.68 less a setoff of $2,184.92 for a net claim of $47,487.76; of this amount $9,640.63 was not attributable to petitioner's purchases of coin and currency from Canada Bank. Of the $7,123.16 paid to Canada Bank in 1969, $5,740.67 was attributable to petitioner's purchase of coin and currency.

In addition, petitioner's attorneys paid the following court costs and litigation expenses connected with the bankruptcy proceedings:

| Payee | Amount |
|---|---|
| W. Arthur Dwyer, clerk | $1,421.81 |
| Edgar Blumberg, trustee | 704.71 |
| Trustee's attorney | 3,500.00 |
| Petitioner's attorney | 1,905.75 |
| Total | [1]7,532.27 |

[1] Of the $7,532.27, $6,850.23 was attributable to business related claims.

On July 11, 1969, petitioner was discharged from bankruptcy by the U.S. District Court for the Northern District of New York. Since that time, petitioner has maintained no significant business relationship with the creditors with whom he dealt in 1963 and before. During the taxable year 1969 petitioner and his daughter were engaged in a foreign coin, numismatic business, primarily involving the collection, purchase, and sale of Canadian coin. This activity involved coins whose values were primarily derived from their content and limited issue, as distinguished from the general purchase, sale, and exchange of coin and currency business which terminated in 1963. On his Federal income tax return for the taxable year 1968, petitioner reported gross receipts from the sale of foreign coins in the amount of $467,367.85. In addition, petitioner was an agent for the York Mills Trading Co. and his principal activity in that regard was the purchase of silver. He reported income from this activity in the amount of $30,978.88.

The payment of $69,908.67 and the administrative expenses of $7,532.27, or $77,440.94, was deducted by petitioner as costs of goods sold on his Federal income tax return for the taxable year 1969. No part of this amount was deducted by petitioner or the trustee in bankruptcy on any Federal income tax returns filed for any taxable year prior to the taxable year 1969.

The Commissioner, in his statutory notice of deficiency, determined that petitioner understated gross receipts by $78,003 and that petitioner had not demonstrated that any portion of such amount was excludable or constituted

ordinary and necessary business expenses or expenses incurred for the production of income.

OPINION

In the taxable year 1963, petitioner was a coin and currency broker engaged in the purchase and sale of coin and currency. During that year, petitioner purchased but was unable to pay for coin and currency in an amount exceeding $400,000. Subsequently, in 1969 pursuant to order of the bankruptcy court, petitioner paid his trade creditors an amount equal to 15 percent of the indebtedness each had asserted in the bankruptcy court. These payments aggregating $69,908.67 (payment) were made directly to the creditors outside the bankruptcy estate from petitioner's funds.

Petitioner maintains that these expenses were inextricably linked to his trade or business and, therefore, the payment is deductible as "cost of sales" or as an ordinary and necessary business expense. We agree.

Respondent contends that petitioner's payment to his trade creditors was made primarily to obtain a discharge in bankruptcy, to protect his remaining personal assets, and to establish a new business. Therefore, respondent asserts that the payment was not ordinary and necessary but rather was essentially a capital expenditure.

Although the precise characterization of the nature of petitioner's business activities during the taxable year 1963 is somewhat difficult to discern, we are nevertheless satisfied that had the payment been made in 1963 it would have reduced petitioner's gross receipts, being in the nature of cost of goods sold. Moreover, when the liability for payment for purchases of coin and currency arose, it was clearly ordinary and necessary to petitioner's business, the essence of which was buying, selling, exchanging, and transporting U.S. and foreign currency and coin. See *Deputy v. duPont,* 308 U.S. 488 (1940). However, at that point in time petitioner was unable to pay these obligations and he commenced bankruptcy proceedings. Subsequently, and prior to his discharge in bankruptcy, 15 percent of each debt was paid by petitioner directly to such creditor.

It is fundamental to the cash basis method of accounting that the mere liability for payment is insufficient and a

deduction for a business expense can only be allowed in the taxable year in which payment is actually made. *Helvering v. Price,* 309 U.S. 409 (1940); sec. 1.461–2(a)(1), Income Tax Regs. Costs of goods sold are to be accounted for and reported for tax purposes in accordance with the taxpayer's method of accounting.[1] Sec. 1.61–3(a), Income Tax Regs. Herein, if petitioner, a cash basis taxpayer, is to be allowed a deduction for these expenditures, it must be in the taxable year 1969 when payment was made.

Simply stated, bankruptcy proceedings seek to effect a fair and equal distribution of the bankrupt's remaining assets among his creditors. The discharge in bankruptcy extinguishes only the creditors' remedy and provides the bankrupt a personal defense against enforcement; it does not alter the nature or the inherent character of the indebtedness. *Zavelo v. Reeves,* 227 U.S. 625, 629 (1913); *Brenner v. Commissioner,* 62 T.C. 878 (1974). Therefore, an item, otherwise deductible when paid, remains so without regard to the intervention of the bankruptcy proceedings. When petitioner paid his creditors for coin and currency, albeit some years late, he merely repaid debts incurred for costs of goods sold which remained in existence and which he owed despite his bankruptcy. It is of no moment that petitioner was no longer conducting the same business when payment to the creditors was made because an individual cash basis taxpayer may deduct, when paid, ordinary and necessary business expenses or cost of goods sold, the liability for which arose in the active conduct of a trade or business, even if payment is made subsequent to the termination of that business. *Flood v. United States,* 133 F.2d 173 (1st Cir. 1943); *Burrows v. Commissioner,* 38 B.T.A. 236 (1938); see *Kornhauser v. United States,* 276 U.S. 145 (1928).

The record in this case does not support respondent's contention that petitioner's 15-percent payment was made to enhance his business standing or to establish a new business. While we recognize that any payment by a bankrupt to his creditors may incidentally affect his business standing, petitioner had only very insubstantial business contact with

---

[1] We need not reach the question as to whether petitioner should have been on the accrual method of accounting in 1963 because respondent makes no such contention; moreover, the record is not adequate to decide whether he should have been on the accrual method. Cf. sec. 1.446–1(c)(2)(i), Income Tax Regs.

the creditors whom he repaid in 1969 and, in our view, the repayment of these creditors is insufficient to create a capital asset in the nature of goodwill. Moreover, we think respondent's suggested metamorphosis of deductible business expenses or costs of goods sold into some sort of capital asset simply by the intervention of the bankruptcy proceedings or the passage of time by focusing on events surrounding petitioner's discharge in bankruptcy is inconsistent with our decisions in *Brenner v. Commissioner, supra,* and *Burrows v. Commissioner, supra.* Similarly, respondent takes the position that the rarity of payment in this manner (outside the bankruptcy court) demonstrates that it was not ordinary and necessary. Once again respondent has focused on events occurring at the time of payment instead of the business context in which the liability to repay arose. This theory is inconsistent with *Brenner* and *Burrows* and respondent's own Rev. Rul. 67–12, 1967–1 C.B. 29. Petitioner's obligation to pay his creditors sprang from business transactions and we hold that his settlement payment retains that character. *Anchor Coupling Co. v. United States,* 427 F.2d 429 (7th Cir. 1970), cert. denied 401 U.S. 908 (1971); cf. *Woodward v. Commissioner,* 397 U.S. 572 (1970); cf. *United States v. Gilmore,* 372 U.S. 39 (1963). Moreover, to disallow a deduction to petitioner for repayment of his purchase of coin and currency would have as its effect the imposition of a tax on gross receipts and not gross income; clearly only gross income, not gross receipts, can be subject to tax. *Sullenger v. Commissioner,* 11 T.C. 1076 (1948).

Respondent also asserts that "the conclusion is inescapable" that petitioner's payment was structured to circumvent our decision in *Mueller v. Commissioner,* 60 T.C. 36 (1973). While we are inclined to agree, it is well established that a taxpayer is under no duty to arrange his affairs in the way most beneficial to the Federal Treasury. *Gregory v. Helvering,* 293 U.S. 465 (1935). Moreover, we can perceive little abuse in the repayment by a cash basis taxpayer in real dollars of debts incurred by him in the conduct of his business. Compare, e.g., *Libson Shops, Inc. v. Koehler,* 353 U.S. 382 (1957) (wherein the taxpayer unsuccessfully attempted to set off premerger losses of one business against postmerger income of another).

Finally, respondent contends that petitioner's payment to his trade creditors prior to his discharge in bankruptcy was

illegal, against public policy, and a fraud upon the Bankruptcy Act and, therefore, not deductible; at trial he also contended that such payment was immoral but he did not argue that point on brief. We are unable to agree. From the record we can only conclude that petitioner's offer to pay his creditors an amount equal to 15 percent of their respective claims from funds obained outside the bankruptcy estate, if somewhat unusual, was conducted in an open, forthright, and honest manner. The bankruptcy court was fully apprised of all aspects of the proceedings and was most certainly in the best position to ascertain the propriety of the transaction. See *Paramount Finance Co. v. United States*, 304 F.2d 460 (Ct. Cl. 1962). The payment was made pursuant to and in reliance upon the order of the bankruptcy court granted upon formal application of the trustee. We are most certainly unwilling to impugn the integrity of that court and the parties to that proceeding simply because, in respondent's view, the transaction was illegal.

In our findings of fact we have detailed the amounts paid by petitioner with respect to his purchases of coin and currency. The amount paid each creditor was calculated pro rata based upon the total amount of the debt asserted by each. To the extent that a particular debt was attributable to a loan or overdraft, a like percentage of the pro rata payment was applied to it and not the purchase of coin and currency. Those debts retained their character as loans and repayment is clearly not deductible. *Brenner v. Commissioner, supra.* Setoffs were allocated on the ratio of the deductible portion to the total debt.

Accordingly, we hold that petitioner is only entitled to a deduction of $62,557.59 which we have found to be attributable to his purchases of coin and currency.

Petitioner also seeks to deduct court costs and litigation expenses which related solely to the separate proceedings which authorized his 15-percent payment. No deduction is sought for fees and expenses incurred at other stages of the bankruptcy proceeding. The deductibility of such expenses is dependent upon the origin and character of the claim to which they relate. To the extent that a creditor's claim arises out of the ordinary course of business, the attendant costs and litigation expenses are deductible. *United States v. Gilmore,*

*supra; Commissioner v. Tellier,* 383 U.S. 687 (1966). Therefore, to the extent that the fees are attributable to the repayment of petitioner's indebtedness for coin and currency, they are deductible. However, except with respect to loans aggregating $6,858.25 owing to the Canadian Imperial Bank, petitioner has failed in his burden of proving that the loan transactions were business related. *Welch v. Helvering,* 290 U.S. 111 (1933). Accordingly, costs attributable to repayments of loans not shown to be business related are not deductible.

In applying the appropriate percentage to the fees, we have included an amount equal to 15 percent of the $6,858.25 owned to the Canadian Imperial Bank for loans, adjusted for setoff or $1,020.96. An amount which bears the same ratio to petitioner's court costs and litigation expenses as $63,578.55 ($62,557.59 + $1,020.96) bears to petitioner's total payment of $69,908.57 is deductible as a business expense. *United States v. Gilmore, supra.* Accordingly, we hold that of the $7,532.87 paid by petitioner for litigation expenses, $6,850.79 is attributable to business-related claims and deductible in the taxable year 1969.

*Decision will be entered under Rule 155.*