WALTER AINSWORTH, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Ainsworth v. Commissioner
Docket No. 17313-82.
United States Tax Court
T.C. Memo 1987-398; 1987 Tax Ct. Memo LEXIS 395; 54 T.C.M. (CCH) 122; T.C.M. (RIA) 87398; August 11, 1987. Joe K. Gordon, for the petitioner. Helen T. Repsis, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency of $ 40,424 in petitioner's Federal income tax for taxable year 1978. Some of the issues raised by the pleadings have been disposed of by agreement of the parties leaving for decision the amount, if any, of net operating loss carrybacks from the taxable years 1979 and 1980 to the taxable year 1978. The specific issues with respect to the amount, if any, of *398 the loss carrybacks are: (1) whether petitioner is entitled to the section 1244[1] stock loss claimed on his 1979 return, and if he is, whether that loss may be carried back to 1978; (2) whether petitioner is entitled to the Schedule E loss from a small business corporation claimed on his 1980 return and, if he is, whether that loss may be carried back to 1978; and (3) whether petitioner has adequately substantiated certain Schedule C deductions claimed on his 1979 and 1980 returns and additional amounts of deductible business expenses not shown on those returns but claimed at the trial. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioner, Walter Ainsworth, who resided in Arlington, Texas at the time of the filing of his petition in this case, filed a joint Federal income tax return with this then wife, Marilyn Ainsworth, [2] for the taxable year 1978. *399 On October 28, 1982 petitioner filed a Federal income tax return, Form 1040, for taxable year 1979 and a Federal income tax return, Form 1040X, for taxable year 1978 claiming a loss carryback to 1978 from the 1979 taxable year. Also on October 28, 1982 petitioner filed a Federal income tax return, Form 1040, for taxable year 1980 and a Federal income tax return, Form 1040X, for taxable year 1978 claiming a loss carryback to the year 1978 from the 1980 taxable year. From late 1971 or early 1972 until December 1974 petitioner was employed by Motown Record Corporation ("Motown"). After leaving Motown he and another person formed Whitfield Records. Petitioner worked at Whitfield Records until mid-1977. Petitioner left Whitfield Records in June 1977 to form his own company, Dr. Rock Productions, Inc. (Dr. Rock) which was incorporated on July 15, 1977. Dr. Rock filed corporate Federal income tax returns, Forms 1120, for its fiscal years ending June 30, 1978 and June 30, 1979. No contributions to the capital of Dr. Rock were reflected on those Forms 1120 or otherwise shown to have been made to Dr. Rock. In 1978 petitioner executed three promissory notes in favor of Security Pacific *400 National Bank ("SPNB") dated May 1, 1978, June 19, 1978, and August 18, 1978 in the amounts of $ 20,000, $ 30,000 and $ 30,000, respectively. In approximately June 1979 Dr. Rock ceased operations but filed no formal dissolution papers. Dr. Rock filed for bankruptcy in the summer of 1981. Syndicate It, Inc., ("Syndicate It") was incorporated in 1980 by petitioner and Robert Dockery to produce and record radio programs for syndication. One of the programs it produced was Jazz Chronicles. A copy of a cashier's check drawn on Cathay Bank, Los Angeles, dated June 26, 1980 payable to Syndicate It for $ 700 and a cashier's check drawn on Cathay Bank, Los Angeles, dated September 8, 1980 payable to Syndicate It for $ 5,000, were produced at the trial. On the Form 1120S filed by Syndicate It for taxable year 1980, no amount was shown as capital stock or paid-in as capital surplus. On its Form 1120S for 1980 Syndicate It reflected a loss of $ 12,896 and the Schedules K-1 for each incorporator reflected a loss of $ 6,448. On July 22, 1977, petitioner entered into a Vehicle Lease Agreement for a 1977 BMW. He continued to lease the BMW until the spring of 1980 when it was repossessed. *401 In 1979 petitioner paid $ 3,957.59 on this lease consisting of: $ 3,662.80 in rent, $ 219.79 in tax and $ 75 in late charges. In 1980 petitioner paid $ 820 on the BMW lease. During 1979 petitioner owned a 1979 Datsun 280Z used primarily by his wife. In 1979 petitioner paid as automobile repairs an amount of $ 1,472.36 and an amount of $ 847 for a short-term automobile lease. During 1979, petitioner began a music business consulting service as a sole proprietor and maintained an office for this business in Marina Del Ray, California. Petitioner paid rent in the amount of $ 6,000 for this office during 1979. During 1979 petitioner paid Studio Intrument Rentals ("S.I.R.") $ 6,500 with two checks, one dated January 19, 1979 and the other dated February 17, 1979 in the amounts of $ 2,500 and $ 4,000, respectively. Petitioner maintained an appointment calendar in 1980. On a number of dates a name would be entered with the notation lunch and an amount. The total of the amounts shown on this appointment calendar for 1980 is $ 3,537. All of the adjustments made by respondent in his notice of deficiency and raised in the original petition have been disposed of by agreement *402 of the parties. The claimed loss carrybacks from 1979 and 1980 to 1978 now in issue are raised by an amendment to petition filed approximately one month prior to the date of the trial of this case. OPINION
Section 1244 Stock Loss
On his 1979 Federal income tax return petitioner claimed a section 1244[3] stock loss in the amount of $ 33,399. On the attached Form 4797 petitioner listed under month-day-year acquired "1977", under month-day-year sold "1979", and under basis $ 33,399. Petitioner claimed a total loss on his 1979 return of $ 51,910 and seeks to carry this loss back to his 1978 taxable year. *403 In our consideration of the claimed section 1244 loss on stock, we will assume that the contribution of money to Dr. Rock, if any, was made prior to November 7, 1978 as the requirements of section 1244 were revised for stock issued after that date. Subject to certain limitations section 1244 allows an individual to treat a loss on section 1244 stock issued to that individual (or a partnership) as an ordinary loss rather than a loss from the sale or exchange of a capital asset. Stock issued prior to November 7, 1978 was required to satisfy the following conditions to qualify as a section 1244 stock: (1) it had to be common stock of a domestic corporation (section 1244(c)(1)); (2) during the five most recent taxable years ending prior to the loss (or lesser period of time if the corporation was not in existence for that length of time) the corporation must have derived more than 50 percent of its total gross receipts from non-passive sources (section 1244(c)(1)(E)); (3) the stock must have been issued for money or property (other than stock and securities) (section 1244(c)(1)(D)); and (4) *404 the stock must have been issued pursuant to a written plan adopted by the corporation after June 30, 1958 to offer that stock for a period (not more than two years after the plan was adopted) specified in the plan and at the time of adoption of the plan no portion of a prior offering was outstanding and the corporation was a small business corporation. Section 1244(c)(1)(A), (C) and (B). Section 1.1244(c)-1(b) Income Tax Regulations require that the plan be a written plan. Respondent does not contest the fact that Dr. Rock was a small business corporation or that it satisfied the passive income requirements. However, respondent disputes whether petitioner has satisfied the issuance of stock for money or property requirement and whether the stock was issued pursuant to a written plan. Petitioner testified that Dr. Rock was capitalized with the funds which he borrowed from SPNB in 1978. However, petitioner presented no documentary evidence to establish that Dr. Rock did, in fact, ever issue any stock. There were no corporate minutes, stock certificates, Forms 1120 reflecting capital contributions or any other indicia of a stock issuance by Dr. *405 Rock to petitioner. As respondent noted, petitioner was the sole incorporator of Dr. Rock and as such would have had access to this evidence if any existed. This Court has repeatedly noted that a taxpayer's failure to present evidence within his possession which if true would be favorable to him leads to the presumption that it would be unfavorable if produced. Davis v. Commissioner,88 T.C. 122, 143 (1987). Consequently, we conclude from the evidence that Dr. Rock did not issue stock to petitioner which qualified as section 1244 stock and thus petitioner is not entitled to a section 1244 ordinary loss. Further, since Dr. Rock was incorporated in 1977 and petitioner allegedly made his contribution to capital with the borrowed funds in 1978, the attendant increase in basis of outstanding stock would not qualify as an "issuance" and thus does not allow petitioner to utilize section 1244 with respect to his 1978 "contributions." Section 1.1244(c)-1(b), Income Tax Regs.
Based upon the conclusions above, we need not fully address respondent's additional arguments that petitioner has not established that Dr. Rock stock was issued pursuant *406 to a requisite written plan, that petitioner has not established either the worthlessness of the stock under section 165 or the year of such worthlessness, and that petitioner has not established the amount of the loss incurred since he failed to produce evidence of his basis in the Dr. Rock stock. However, we do note that petitioner produced no evidence of a written plan for issuance of the stock of Dr. Rock.
Subchapter S Loss
On his 1980 tax return petitioner claimed a Schedule E loss from a small business corporation, Syndicate It, in the amount of $ 8,416. This amount is part of a $ 25,052 total loss claimed on his 1980 return which petitioner seeks to carry back to taxable year 1978. Syndicate It claimed for taxable year 1980 a loss in the amount of $ 12,896 and showed petitioner's share on the Schedule K-1 attached to the Form 1120S as $ 6,448. Jazz Chronicles, one of the syndicated radio programs produced by Syndicate It, showed a $ 16,832 loss on its profit/loss statements as of December 31, 1980.
In general section 1374[4] allows shareholders of electing small business *407 corporations a deduction from their gross income for their portion of the corporation's net operating loss for its taxable year. However section 1374(c) limits the amount of a shareholder's portion of the electing small business corporation's net operating loss to the sum of the adjusted basis of the shareholder's stock and the adjusted basis of any corporate indebtedness owed to that shareholder. *408 Respondent does not contest Syndicate It's qualification as a subchapter S corporation but contends that petitioner has neither substantiated the amount of the net operating loss claimed by Syndicate It for 1980 nor established his adjusted basis in Syndicate It's stock or indebtedness. Petitioner claims that he invested $ 5,700 in Syndicate It with money he received from an insurance loss, and was, as a result, a 50-percent shareholder in Syndicated It during 1980 when it reported the loss of $ 12,896 or its Form 1120S. Petitioner contends that since respondent has not claimed that the Syndicate It expenses were excessive or exorbitant that "the figures should speak for themselves" thus relieving petitioner of his burden [5] of substantiating the claimed amounts. Petitioner admits respondent is correct in questioning the amounts since a $ 12,896 loss (or $ 6,448 per shareholder) was shown on the Form 1120S filed by Syndicate It, whereas petitioner claims a loss of $ 8,416. According to petitioner, the discrepancy results from the work of two different return preparers, the preparer of the Form 1040 filed by petitioner using the larger figure in order to "do the best job possible *409 for his client." Petitioner admits his $ 5,700 "contribution" is not reflected on the Form 1120S filed by Syndicate It but places the blame on his return preparer contending, that he should "not be penalized for the unfortunate mistake of retaining the wrong accountant." We, however, agree with respondent that petitioner has failed to substantiate either the amount of losses claimed by Syndicate It or his adjusted basis in Syndicate It stock or indebtedness. Petitioner has provided no documentation to support the claimed receipts or deductions for Syndicate It for 1980 or for the profit/loss statement for Jazz Chronicles. The Form 1120S filed by Syndicate It and the profit/loss statement of Jazz Chronicles are not sufficient to establish the claimed losses which were challenged by respondent. Petitioner presented no evidence to attempt to reconcile the discrepancies between the loss shown for Jazz Chronicles, one of the programs produced by Syndicate It, and the loss reported by Syndicate *410 It, or explain why he claimed a deduction of one half of the loss shown on the Jazz Chronicles profit/loss statement. Accordingly, we hold that petitioner has failed to carry his burden of proof as to the amount of the claimed loss from Syndicate It. Petitioner has also failed to establish his basis in Syndicate It stock or indebtedness. The two cashier's checks in the amount of $ 5,700 payable to Syndicate It provide no indication of their purpose. No corporate records were presented to establish that this amount was paid as a contribution to capital and the Form 1120S filed by Syndicate It did not show this alleged capital investment. Petitioner made no claim and presented no evidence that the amount of $ 5,700 was a loan made by him to Syndicate It. Thus, we conclude petitioner has not carried his burden of proof as to his adjusted basis in Syndicate It stock or indebtedness. [6]
Schedule C Expenses
*411 Section 162(a) allows deductions for ordinary and necessary business expenses paid or incurred in carrying on a trade or business. Petitioner claimed the following Schedule C deductions on his 1979 and 1980 returns: 1979
1980
Utilities
$ -0-
$ 1,447
Freight
241
95
Office supplies
-0-
1,354
Car and truck expenses
5,368
3,203
Travel and entertainment
1,200
3,537
Legal and professional
services
750
2,500
Rent on business property
9,789
4,500
Respondent does not contest the freight expense for 1979, the travel and entertainment expense of $ 3,537 for 1980 or $ 6,000 of the claimed expenses for rent on business property in 1979. At trial petitioner claimed amounts of business expenses in addition to those claimed on his 1979 and 1980 returns.
a. Miscellaneous Deductions -- On brief petitioner coneded that he had not shown that he was entitled to deduct travel and entertainment expenses for 1979, legal and professional expenses for 1979, utility expenses for 1980, freight expenses for 1980 and office supply expenses for 1980.
b. Rent on Business Property
On his 1979 return, petitioner claimed a rental deduction of $ *412 9,789 for the rental of business property. At the trial petitioner introduced evidence from the owner of the property at which he conducted his business acknowledging the receipt from petitioner in 1979 of $ 6,000 for rental or the property. Petitioner presented no evidence with respect to any amount above the $ 6,000 and respondent concedes the deduction up to that amount. At trial petitioner claimed an additional business rental deduction of $ 6,500 which he contends were evidenced by two cancelled checks in that amount payable to S.I.R. Petitioner's uncontroverted testimony was that these amounts were paid to rent rehearsal studios and studio quality instruments for his recording groups. While petitioner did not produce business records or bills from S.I.R. identifying the charges covered by the checks totalling $ 6,500, we accept the cancelled checks along with petitioner's testimony as sufficient substantiation to support this claimed rental expense deduction and conclude that in 1979 petitioner paid a total rental expense of $ 12,500. Petitioner claimed on Schedule C of his 1980 return a deduction for a business rental expense in the amount of $ 4,500. To substantiate *413 this amount, petitioner produced a copy of a cashier's check payable to Debra L. Anderson in the amount of $ 8,500. Petitioner contends that a portion of this check was a payment for rental of recording equipment and the remainder was for rental of a car. The check itself provides no indication of the identity of the purchaser and does not indicate the use to which the funds were to be put. Petitioner failed to produce a bill or receipt of any sort from Debra L. Anderson or any other business books or records to support the alleged use of this money. In the absence of such evidence we hold petitioner has failed to meet his burden of proof under Rule 142(a) with respect to the rental deduction or auto expense deduction related to the $ 8,500 payment to Debra L. Anderson.
c. Car and Truck Expenses
Petitioner claimed a deduction for automobile expenses for 1979 in the amount of $ 5,368 [7] which was stated to represent 80 percent of the car rental expenses of $ 3,957.59 on the leased BMW and 80 percent of car repair expenses of $ 1,472.36. Petitioner contends he claimed 80 percent on the advice of his CPA. He also contends that since he testified that he used his car extensively *414 in his business, 80 percent is reasonable. Petitioner also claimed a deduction in 1979 for an $ 847 expense, reflected by a check payable to Warren Briggs Leasing. Petitioner testified that amount was expended for the lease of several cars for the musical groups he was representing at that time. For 1980 petitioner claimed a deduction for automobile expenses of $ 3,203. To substantiate this amount petitioner presented a receipt for automobile lease payments in the amount of $ 820 and the $ 8,500 Debra L. Anderson check previously addressed in the "Rent on Business Property" discussion. Respondent concedes petitioner paid $ 3,957.79 in 1979 and $ 820 in 1980 on the BMW lease but disputes whether petitioner is entitled to an 80 percent business use deduction. [8]
*415 Petitioner produced no log or other business records to substantiate his claimed 80 percent business use of the BMW. However, the record shows he did in fact incur deductible expenses for use of his automobiles. It is therefore necessary to approximate as best we can from the record the amount allowable. In so doing, we bear heavily "upon the taxpayer whose inexactitude is of his own making." Cohan v. Commissioner,39 F.2d 540, 545 (2d Cir. 1930). This Court has on numerous occasions been called upon to apply the Cohan rule to determine the amount of deductible automobile expenses. See Gestrich v. Commissioner,74 T.C. 525, 531 (1980), affd. without published opinion 681 F.2d 805 (3d Cir. 1982) (10 percent); D'Angelo Associates, Inc. v. Commissioner,70 T.C. 121, 138 (1978) (65 percent); Marcello v. Commissioner,43 T.C. 168, 175 (1964) (40 percent); Sapp v. Commissioner,36 T.C. 852, 855 (1961), affd. 309 F.2d 143 (5th Cir. 1962) (75 percent). In this case, based upon the available evidence and the unusual nature of petitioner's business, we estimate business *416 use by petitioner of the BMW of 50 percent of the lease expenses [9] of $ 3,957.79 in 1979 and $ 820 in 1980. Similarly we conclude that petitioner is entitled to a deduction of 50 percent for certain repair costs. Petitioner claimed repair costs of $ 1,472.36 which we accept as valid with the exception of the $ 304.31 expended for tires. This amount was evidenced by a personal check from petitioner's former wife, Marilyn Ainsowrth, and as she drove the car petitioner owned during the years in issue, the Datsun 280Z, we conclude petitioner has not carried his burden of proof with respect to this claimed $ 304.31 expended for tires. The $ 847 claimed by petitioner as a deduction for the leasing of cars for his music groups was paid to Warren Briggs Leasing. This fact combined with petitioner's uncontroverted testimony that the payment was for leasing cars for his music group supports the fact that the amount was a business expense and we hold the $ 847 to *417 be properly deductible as a business expense.
d. Other Expenses:
At the trial, petitioner claimed business expense deductions for 1979 in addition to those claimed on his return, for amounts paid to backup musicians and to the musicians' pension fund and health and welfare fund in a total amount of $ 5,281.39. [10] Petitioner further claims $ 6,727.50 as a deduction in 1979 for interest on business indebtedness. Based on the evidence we conclude petitioner is entitled to deduct the payments made to the musicians and the two musicians' funds which were evidenced by a cash receipt or cashier's checks identifying petitioner as the purchaser totalling $ 4,673.39 but not the amount shown on the cash receipt of $ 650 allegedly from Butch Asendo which was signed by a Richard Johnson. We find petitioner is not entitled to the claimed interest deductions. The $ 6,727.50 consists of $ 1,282.51 evidenced by a check to Wells Fargo Bank dated January 23, 1979 and $ 5,445 shown on a statement from Wells Fargo to petitioner listing interest payments between January 1, 1979 and *418 December 31, 1979. There is nothing in the record to indicate that the $ 1,282.51 paid by check is not included in the listed interest payments of $ 5,445. Petitioner introduced into evidence a $ 70,000 promissory note dated June 29, 1979 which was payable in full August 28, 1979. This note does not support a January 1979 interest payment. There is no explanation why interest on a loan that became due August 28, 1979 would be made on November 31, 1979. Petitioner introduced no other documents evidencing loans to support business debt to Wells Fargo Bank. Petitioner testified that the $ 1,282.51 was interest paid on a personal debt and has failed to show that the balance of the interest claimed was not interest on personal indebtedness. At the trial, petitioner claimed that he paid a total of $ 3,029 to backup musicians during 1980. These amounts claimed to be dedutible were evidenced by cashier's checks totalling $ 2,100 and personal checks totalling $ 929. The three cashier's checks did not identify the purchaser and petitioner provided no other records to support the payment of these amounts. We therefore conclude that petitioner has failed to establish that the $ 2,100 *419 of cashier's checks represented amounts paid to backup musicians. On this record, we conclude that the personal checks for $ 929 were payments to backup musicians which are properly deductible by petitioner as a business expense. Petitioner claimed a deduction in the amount of $ 231.91 for expenses he states were incurred for the purchase of meals for one of his groups while they prepared to record an album. Section 274 disallows certain section 162 deductions unless the taxpayer establishes a business relationship and satisfies specific substantiation requirements under section 274(d). However section 274(e)(1)[11] provides a specific exception to the application of section 274(a) for the expenses for food and beverages provided under circumstances conducive to business discussion. Under the circumstances present in this case, we conclude4 that petitioner has substantiated the payment of the $ 231.91 for meals for his musicians and has shown that amount to be deductible in 1980. Petitioner paid for the band's lunch and had it delivered to the members of the band at the studio at a *420 time when they were spending 8 to 10 hours per day rehearsing. This is the type of situation to which section 274(e)(1) is applicable. e. Legal and Professional Services
Petitioner conceded that he is not entitled to deduct the legal and professional expenses claimed on his 1979 return. Petitioner on his 1980 return claimed a deduction in the amount of $ 2,500 for legal and professional expenses. At the trial he claimed to have paid $ 3,000 of legal and professional expenses in 1980. *421 Petitioner introduced a copy of a cashier's check in the amount of $ 2,500 payable to Joe Porter III but did not show who was the purchaser of the check. Petitioner also introduced a copy of a personal check in the amount of $ 500 drawn on his account payable to Ron Michelman. Although petitioner testified the $ 2,500 amount was paid for legal fees regarding a contract dispute, he had no underlying documentation with respect to the $ 2,500 cashier's check he allegedly paid to Porter nor any evidence to show the nature of the service alleged to have been rendered by Mr. Porter so that a determination could be made as to whether the alleged services were rendered in connection with a personal or business matter. On the evidence presented we conclude that petitioner has not established that the $ 2,500 was a deductible business expense. The record shows that the $ 500 check to Michelman was a payment for legal services with respect to a bankruptcy proceeding in order to determine origin of the bankruptcy proceeding in order to determine whether the $ 500 expense is a deductible trade or business expense or is nondeductible. United States v. Gilmore,372 U.S. 39, 49 (1963). *422 If we find that a taxpayer's personal bankruptcy has a proximate relationship to his trade or business, the bankruptcy legal expenses are deductible expenses. Dowd v. Commissioner,68 T.C. 294, 303-304 (1977). [12] There is some indication in the record that petitioner's business dealings were unsuccessful. However, there is not sufficient evidence of a proximate relationship between his miscellaneous business activities and his personal bankruptcy to consider the bankruptcy legal expense to be trade or business expenses. We, therefore, conclude that the $ 500 is not deductible as a trade or business expense. *423 Decision will be entered under Rule 155.
Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Petitioner and Marilyn Ainsworth were subsequently divorced and the deficiency in this case has been determined only against petitioner. ↩
3. Section 1244 reads in pertinent part as follows:
SEC. 1244. LOSS ON SMALL BUSINESS STOCK. (a) General Rule. -- In the case of an individual, a loss on section 1244 stock issued to such individual or to a partnership which would (but for this section) be treated as a loss from the sale or exchange of a capital asset shall, to the extent provided in this section, be treated as an ordinary loss. * * * (c) Section 1244 Stock Defined. -- (1) In General. -- For purposes of this section, the term "section 1244 stock" means common stock in a domestic corporation if -- (A) such corporation adopted a plan after June 30, 1958, to offer such stock for a period (ending not later than two years after the date such plan was adopted) specified in the plan, (B) at the time such plan was adopted, such corporation was a small business corporation, (C) at the time such plan was adopted, no portion of a prior offering was outstanding, (D) such stock was issued by such corporation, pursuant to such plan, for money or other property (other than stock and securities), and (E) such corporation, during the period of its 5 most recent taxable years ending before the date the loss on such stock is sustained (or if such corporation has not been in existence for 5 taxable years ending before such date, during the period of its taxable years ending before such date, or if such corporation has not been in existence for one taxable year ending before such date, during the period such corporation has been in existence before such date), derived more than 50 percent of its aggregate gross receipts from sources other than royalties, rents, dividends, interest, annuities, and sales or exchanges of stock or securities (gross receipts from such sales or exchanges being taken into account for purposes of this subparagraph only to the extent of gains therefrom); except that this subparagraph shall not apply with respect to any corporation if, for the period referred to, the amount of the deductions allowed by this chapter (other than by sections 172, 243, 244, and 245) exceed the amount of gross income. Such term does not include stock if issued (pursuant to the plan referred to in subparagraph (A)) after a subsequent offering of stock has been made by the corporation. ↩
4. Section 1374 provides in pertinent part as follows:
SEC. 1374. CORPORATION NET OPERATING LOSS ALLOWED TO SHAREHOLDERS. (a) General Rule. -- A net operating loss of an electing small business corporation for any taxable year shall be allowed as a deduction from gross income of the shareholders of such corporation in the manner and to the extent set forth in this section. * * * (c) Determination of Shareholder's Portion. -- (1) In General. -- For purposes of this section, a shareholder's portion of the net operating loss of an electing small business corporation is his pro rata share of the corporation's net operating loss (computed as provided in section 172(c), except that the deductions provided in part VIII (except section 248) of subchapter B shall not be allowed) for his taxable year in which or with which the taxable year of the corporation ends. For purposes of this paragraph, a shareholder's pro rata share of the corporation's net operating loss is the sum of the portions of the corporation's daily net operating loss attributable on a pro rata basis to the shares held by him on each day of the taxable year. For purposes of the preceding sentence, the corporation's daily net operating loss is the corporation's net operating loss divided by the number of days in the taxable year. (2) Limitation. -- A shareholder's portion of the net operating loss of an electing small business corporation for any taxable year shall not exceed the sum of -- (A) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of the shareholder's stock in the electing small business corporation, determined as of the close of the taxable year of the corporation (or, in respect of stock sold or otherwise disposed of during such taxable year, as of the day before the day of such sale or other disposition), and (B) the adjusted basis (determined without regard to any adjustment under section 1376 for the taxable year) of any indebtedness of the corporation to the shareholder, determined as of the close of the taxable year of the corporation (or, if the shareholder is not a shareholder as of the close of such taxable year, as of the close of the last day in such taxable year on which the shareholder was a shareholder in the corporation). ↩
5. Tax Court Rule 142(a)↩ places the burden of proof, subject to certain exceptions, upon petitioner. 6. Even if the $ 5,700 had been shown to be petitioner's adjusted basis in the stock, he would not be entitled to his claimed deduction in excess of that amount. Sec. 1374(c)(2)↩.
7. On brief petitioner acknowledges that the amount he claims actually totals $ 5,190.96 consisting of $ 3,957.59 and $ 1,472.36 for a total of $5,429.95 for rental and repair expenses to the BMW. An 80 percent business use of this amount produces an expense of $ 4,343.96 which with the addition of the $ 846 lease expense totals $ 5,190.96. ↩
8. Petitioner conceded on brief that he was not entitled to both a percentage use and a mileage deduction as he had argued at trial. ↩
9. We have previously disallowed a rent on business property deduction with respect to the Debra L. Anderson check and reaffirm our conclusion as to the claimed auto lease expense portion of that check at this time. ↩
10. The amounts in the exhibits actually totals $ 5,323.39 although petitioner claims only $ 5,281.39. ↩
11. Section 274(e)(1) provides in pertinent part as follows: Sec. 274 (e) Specific Exceptions to Application of Subsection (a). -- Subsection (a) shall not apply to -- (1) Business Meals. -- Expenses for food and beverages furnished to any individual under circumstances which (taking into account the surroundings in which furnished, the taxpayer's trade, business, or income-producing activity and the relationship to such trade, business, or activity of the persons to whom the food and beverages are furnished) are of a type generally considered to be conducive to a business discussion.↩
12. See Cox v. Commissioner,T.C. Memo. 1981-552, where the facts established a direct relationship between the taxpayer's bankruptcy and their unsuccessful trade or business. Compare Artstein v. Commissioner,T.C. Memo. 1970-220, where we concluded: There is no showing that the bankruptcy petition was in any way connected with any trade or business of [the taxpayer]. We recognize that this petition was filed because of a judgment obtained against [the taxpayer] in connection with a transaction which originated because of circumstances connected with [the taxpayer's] business activities. However, in our view, this record is insufficient to show the proximate relationship of the filing of the bankruptcy petition to [the taxpayer's] trade or business necessary to support the deductibility of the attorneys' fees as a trade or business expense or an expense in connection with a transaction entered into for profit. ↩