T.C. Memo. 1997-547


UNITED STATES TAX COURT


STEPHEN F. SCOFIELD AND NANCY E. SCOFIELD, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 14305-95.                    Filed December 11, 1997.


<u>Stephen R. Klorfein</u> and <u>Benjamin I. Fink</u>, for petitioners.

<u>Lourdes Gonzalez de Mendoza</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


COLVIN, <u>Judge</u>:  Respondent determined deficiencies in

petitioners' income taxes and additions to tax as follows:

|  |  | Additions to tax | | |
| | | Sec. | Sec. | Sec. |
| <u>Year</u> | <u>Deficiency</u> | <u>6651(a)(1)</u> | <u>6653(a)(1)(A)</u> | <u>6653(a)(1)(B)</u> |
| 1985 | $56,672 | -- | | |
| 1986 | 6,343 | $18,577 | $5,511 | [1] |

| 1987 | 90,373 | 23,940 | 4,788 | [2] |
| 1988 | 148,173 | 7,409 | | |

|  | Additions to tax | | |
|  | Sec. | Sec. | Sec. |
| Year | 6653(a)(1) | 6653(a)(2) | 6661 |
| 1985 | $2,843 | [3] | $14,115 |
| 1986 | | | -- |
| 1987 | | | 22,319 |
| 1988 | 7,409 | | 21,078 |

[1] Fifty percent of the interest due on $6,343.
[2] Fifty percent of the interest due on $90,373.
[3] Fifty percent of the interest due on $56,672.

After concessions, the issues for decision are:

(1) Whether petitioners may deduct $750,000 petitioner-husband paid in 1988 to settle civil litigation related to his guarantee of the debt of Northeast Cellulose, Inc. (Northeast), claims of creditors of Northeast, and his bankruptcy proceedings. We hold that they may not deduct the portion (50 percent) of the settlement payment attributable to petitioner's guaranty of Northeast's line of credit because his dominant motive for making the guaranty was to protect his investment in Northeast. We also hold that they may deduct the portion (50 percent) attributable to claims of Northeast's creditors (other than the bank to which petitioner made the guaranty), subject to the 2-percent limit in section 67, because petitioner's payment to settle claims of Northeast's creditors other than the bank originated in his conduct as an officer or employee of Northeast and in action taken by him as an investor-shareholder of Northeast.

(2) Whether petitioners may deduct legal expenses of $10,243 in 1986, $59,352 in 1987, and $104,156 in 1988. We hold that they may, subject to the 2-percent limit in section 67.

Unless otherwise indicated, section references are to the Internal Revenue Code. Rule references are to the Tax Court Rules of Practice and Procedure.

## I. FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

### A. <u>Petitioners</u>

Petitioners Stephen F. Scofield (petitioner) and Nancy E. Scofield (Mrs. Scofield) are married and lived in Marietta, Georgia, when they filed their petition. Petitioners have been married since 1981 and have four sons.

Petitioner graduated from Syracuse University in 1968 with a degree in economics. He started to work in the newsprint industry that year. He worked for Great Northern Paper Co. (Great Northern) from 1968 to June 1972, primarily in sales positions. Petitioner then worked for about 4 years as sales manager for Eastern Color Printing Co. (ECP), a printing business.

### B. <u>Petitioner's Businesses</u>

#### 1. <u>Unidyne</u>

Petitioner left ECP around 1976 to start a company which he named Unidyne, Inc. (Unidyne). Unidyne was in the paper

recycling business.  Lawrence McKee (McKee) was also associated with Unidyne.  Unidyne stopped doing business in 1977.

2.    Northeast Cellulose, Inc.

In 1977, petitioner (and apparently McKee) started a company called Northeast Cellulose, Inc. (Northeast).  Northeast brokered, bought, and sold newsprint.  Northeast sold commercial printing paper, magazine paper, and newsprint to retailers and printers.

Petitioner was an officer and director of Northeast.  He owned 50 percent of the stock of Northeast, a Massachusetts corporation.  Petitioner invested about $4,000 for his Northeast stock.  McKee was Northeast's other 50 percent stockholder and was president of Northeast.

Petitioner worked about 25 hours per week for Northeast in 1978 and 1979.  Among his other duties, petitioner maintained Northeast's customer and mill contacts.  Northeast did not pay a salary to petitioner in 1979.[1]

Northeast earned a commission on its sales.  Paper mills typically paid a commission to Northeast of 3 percent, after freight and related costs.  At first, Northeast acted as a broker.  Eventually, however, it took title to the paper, which required it to establish lines of credit.

---

[1] The record does not indicate whether Northeast paid a salary to petitioner in any other year.

In 1978 and 1979, Northeast established a line of credit with Guaranty Bank & Trust Company (the bank) in Massachusetts. McKee signed a guaranty dated March 3, 1978, for the line of credit. Northeast used its assets as collateral for the loan. In December 1979, the bank lent about $1.2 million to Northeast on the line of credit. Petitioner signed a guaranty with the bank around January 11, 1980. Northeast used its line of credit with the bank to take title to paper when it was advantageous to do so.

Northeast had retained earnings of $107,058.15 on December 31, 1978, and $183,747.33 on December 31, 1979. At the end of 1979, petitioner submitted a financial statement to the bank in which he estimated that the value of his interest in Northeast as a going concern was about $1 million.

Zayre Corp. (Zayre) was a customer of Northeast. Northeast contracted to sell paper to Zayre. Consolidated Newsprint, Inc. (CNI) produced and sold paper for newsprint and newsprint advertising and contracted to regularly sell products to Northeast.

3. Sigma General, Inc.

Petitioner owned all of the stock of Sigma General, Inc. (Sigma), a New Hampshire corporation he formed in 1978. Sigma placed orders for printing advertising material to be distributed by newspapers. In 1979, Sigma placed orders totaling about $10 million. Petitioner estimated that the value of his interest in

Sigma was about $500,000 early in 1980.[2]  At that time, Sigma had four or five employees.  From late 1980 to 1981, petitioner was Sigma's only employee.  Sigma was sometimes a customer of Northeast.

Sigma paid petitioner a salary of $143,333 in 1979.

Sigma ceased doing business in September 1981.

4.   Norcel, Inc.

In May 1980, petitioner incorporated a company called Norcel, Inc. (Norcel).  He was Norcel's only officer, director, and shareholder.

5.   Wingfoot Corp., Ltd. and Alar, Ltd.

Petitioner was a stockholder and officer of Wingfoot Corp., Ltd. (Wingfoot), a Canadian corporation.  He did not earn a significant amount of income from Wingfoot in 1978 and 1979.

Petitioner started a company in Hamilton, Bermuda, named Alar, Ltd., at a time not stated in the record.

C.   Northeast's Collapse

1.   Cessation of Northeast's Business Activity

Petitioner resigned as an officer from Northeast on June 20, 1980.  In mid-1980, Northeast ceased doing business.

2.   Creditors' Agreement

On August 11, 1980, the bank, CNI, Zayre, and Meredith-Burda, Inc. appointed Virginia Norkevicius (Norkevicius) as

---

[2] The record does not indicate how petitioner used this estimate.

nominee to receive and hold Northeast's assets.  Norkevicius was a vice president of the bank.  For purposes of distributing the remaining assets of Northeast, Northeast's creditors agreed, in August 1980, that Norkevicius would distribute money that she recovered as follows:  the first $200,000 was to be distributed to the bank, and the next $1.6 million was to be given 50 percent to the bank and 50 percent to the other parties.  This agreement was based on how much Northeast owed to each party.  Norkevicius had collected $726,000 when the agreement was signed.

D.   Calta, Inc.

After Northeast and Sigma collapsed, petitioner began working for a company that Mrs. Scofield had formed called Calta, Inc. (Calta), a Massachusetts corporation.  Calta was in the printing business.  When petitioners moved to New Hampshire in 1981, she reincorporated Calta in New Hampshire.  Petitioner worked for Calta from 1981 to 1983 and received a salary of about $5,000 a month.

E.   Petitioner's Litigation Relating to Northeast

Petitioner incurred legal expenses as a defendant in lawsuits brought by the bank, Northeast, CNI, Zayre, and Norkevicius (as nominee), and in related bankruptcy proceedings.

1.   Petitioner's State Court Proceedings

On June 12, 1982, the bank, Northeast, CNI, Zayre, and Norkevicius (as nominee), sued McKee, petitioner, Timothy Samway, Robert E. Davis, Francoise Sterling, Sigma, and Wingfoot in the

Superior Court of Worcester County, Massachusetts (docket no. 82-22879). The plaintiffs alleged that petitioner and the others had: (a) Conspired to terminate the business of Northeast and to appropriate for themselves the business, goodwill, and assets of Northeast; (b) created false invoices; (c) caused Northeast to breach contracts with suppliers and thereby lose future profits; (d) taken equipment and funds of Northeast; and (e) made misrepresentations to Zayre which caused it to buy and immediately pay for a million pounds of premium paper.

In the complaint, the plaintiffs alleged that Northeast owed them $2,958,720.24 when it stopped doing business. They alleged that, at the time the complaint was filed, Northeast owed $561,530.53 to the bank, $406,812.39 to Zayre, and $946,132.33 to CNI. The complaint does not explain why those amounts totaled less than the plaintiffs alleged Northeast owed when it stopped doing business. The plaintiffs alleged that petitioner was liable for Northeast's debts to the bank because he and McKee had signed guarantees.

The bank also sued petitioner, McKee, McKee's wife, and Northeast in the Superior Court of Worcester County, Massachusetts, for the indebtedness of Northeast on the line of credit (docket No. 82-22880). We sometimes refer to these cases as the Northeast litigation.

Petitioner denied the allegations and made counterclaims, cross-claims, and third-party claims. He contended that the

bank, without the approval of Northeast or knowledge of petitioner, let McKee borrow money in Northeast's name that McKee used for highly speculative investments unauthorized by Northeast and for McKee's personal benefit. He also claimed that McKee and one of the bank's officers intentionally misrepresented Northeast's financial condition to induce petitioner to sign the guaranty to the bank, and he sought indemnification from McKee and the bank officer.

Petitioner initially contended during the Northeast litigation that he had not guaranteed Northeast's indebtedness to the bank and that he was not liable for payment on the guaranty. However, in 1984, petitioner acknowledged that he had signed the guaranty in January 1980 and was liable to the bank for payment on the guaranty.

Robert Williams represented petitioner in the Northeast litigation. These cases were settled in 1988. See paragraph I-E-3, below.

### 2. Petitioner's Bankruptcy Case

In September 1983, petitioner filed a petition in the United States Bankruptcy Court for the District of New Hampshire under chapter 7 of the U.S. Bankruptcy Code, seeking a discharge of all of his debts. On the schedules filed with the Bankruptcy Court, petitioner listed personal property having a value of $7,000 and no real property. Petitioner listed the following debts in his bankruptcy petition: (a) Warner & Stackpole ($7,000); (b)

Haussermann, Davison & Shattuck ($6,910); (c) Northeast Cellulose ($18,879,963); (d) Guaranty Bank & Trust Co. v. Lawrence McKee, Stephen F. Scofield and Kay L. McKee ($80,000); (e) Granby Press v. Sigma General, Inc. ($178,000); (f) Calta, Inc. ($66,697); (g) Guaranty Bank & Trust Co. for suit filed in 1982 (unknown amount); and (h) Alar, Ltd. (unknown amount).

Northeast and Norkevicius filed a complaint seeking to deny petitioner's discharge (the adversary proceeding). They alleged that petitioner should be denied a discharge under section 727[3] of the Bankruptcy Code because he committed certain acts intended to hinder, delay, or defraud his creditors. A trial in the adversary proceeding was held in the United States Bankruptcy Court for the District of New Hampshire on January 11, 12, and

---

[3] 11 U.S.C. sec. 727(a) (1994) provides, in part:

Sec. 727. Discharge

    (a) The court shall grant the debtor a discharge, unless--
          *     *     *     *     *     *     *

    (3) the debtor has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case;
          *     *     *     *     *     *     *
    (5) the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;
* * *

13, 1988. Robert Williams, Thomas Keane, and Christopher W. Parker represented petitioner in the adversary proceeding.

### 3. The Settlement Agreement

On April 7, 1988, Norkevicius (as nominee), the bank, CNI, Zayre, and petitioner reached a settlement. In the settlement, the parties resolved all disputes and claims in the Northeast litigation and the adversary proceeding. Petitioner agreed to pay to the plaintiffs $750,000, consisting of $300,000 when he executed the agreement and $450,000 by May 16, 1988. The parties agreed that, if petitioner timely made the payments, the plaintiffs would dismiss their claims and release all defendants in the Massachusetts action (except McKee), and petitioner would dismiss his counterclaims, cross-claims, and third-party claims. The plaintiffs agreed that they would not object to any pleading, action, or motion by petitioner to obtain a discharge in bankruptcy or any other relief which he deemed appropriate in the bankruptcy proceedings.

Petitioner paid $750,000 to the plaintiffs in the Northeast litigation in 1988. On May 16, 1988, the Bankruptcy Court approved the settlement agreement, dismissed the adversary proceeding with prejudice, set aside the order for relief from the voluntary petition, and dismissed the voluntary petition without prejudice. The Bankruptcy Court filed its order on May 26, 1988. Petitioner did not obtain a discharge in bankruptcy.

Neither Northeast nor Sigma did business in 1988. Petitioner worked in the paper and printing business before and after these cases were settled.

4. Petitioners' Legal Fees and Federal Income Tax Returns

a. 1986

Petitioner paid legal fees of $10,243 relating to the Northeast litigation and the adversary proceeding. Petitioners deducted those fees on the Schedule C for petitioners' paper and printing business filed with their 1986 Federal income tax return. They reported no gross receipts and claimed a net loss of $10,243 on Schedule C.

b. 1987

Petitioner paid legal fees in 1987 of $34,083 for the Northeast litigation and $25,269 for the bankruptcy proceedings. The bankruptcy legal fees included fees for: A conference held by the attorneys with Mrs. Scofield, the attendance by attorneys at a deposition of Mrs. Scofield, compilation of bankruptcy pleadings and memos, research regarding discharge and pleadings in bankruptcy, attorney-client privilege in bankruptcy, defenses to objection to discharge, fraudulent conveyance/alter ego exposure, and reviewing Judge Lavien's ruling on alter ego and concealment of assets.

Petitioners deducted those fees ($59,352) on the Schedule C for petitioner's paper and printing business filed with their

1987 return. They reported no gross receipts and claimed that they had a net loss of $59,352 on Schedule C.

        c.   <u>1988</u>

Petitioner paid legal fees of $70,843 for the Northeast proceedings and $33,313 in 1988 for the bankruptcy proceedings. The bankruptcy legal fees included fees for: Attorneys attending the trial on the adversary proceeding in January 1988; research on defenses to bankruptcy discharge under 11 U.S.C. section 727(a)(3) and (a)(5) (1994); compilation of bankruptcy pleadings and memos, including objections to a motion for a Bankruptcy Rule 2004 examination and possible chapter 13 plan before discharge ruling by the court; office conferences, telephone calls, and a trip to New Hampshire to meet with Mrs. Scofield; reviewing Mrs. Scofield's deposition; research on fraudulent conveyance statutes; research on rights of the trustee as a lien creditor; research on the statute of limitations for fraudulent conveyances and statutes of limitations defenses under 11 U.S.C. section 546 (1994); and research on the ability to reach and apply proceeds of fraudulent conveyances.

Petitioners attached a Schedule C for petitioner's paper and printing business to their 1988 tax return. On it, petitioners deducted legal and professional expenses of $104,156 and a bad debt loss of $750,000. They reported no income on the Schedule C and a net loss of $854,156. Petitioners attached to their 1988 tax return a copy of the settlement agreement which released them

from liability for the Northeast litigation and adversary proceeding.

## II.  OPINION

A.  Whether Petitioners May Deduct $750,000 That Petitioner Paid To Settle Civil Litigation and Petitioner's Bankruptcy Proceedings

1.  Whether Petitioner's Settlement Payment Was a Business Bad Debt

Petitioners contend that they may deduct as a business bad debt or as a business expense $750,000 they paid in 1988 to settle the Northeast litigation and petitioner's bankruptcy proceedings.

A taxpayer may deduct debts that become worthless in the taxable year.  Sec. 166(a)(1).  Section 166 distinguishes between business and nonbusiness bad debts.  A business bad debt is a debt created or acquired in connection with the taxpayer's trade or business or a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.  Sec. 166(d)(2). Nonbusiness bad debts of taxpayers other than corporations are short-term capital losses.  Sec. 166(d)(1)(B).

A taxpayer may deduct as a business bad debt a payment it makes to discharge the taxpayer's obligation as a guarantor if: (a) The taxpayer was engaged in a trade or business when he or she made the guaranty, and (b) the guaranty was proximately related to the conduct of that trade or business.  Jones v. Commissioner, T.C. Memo. 1997-368; Weber v. Commissioner, T.C. Memo. 1994-341; Smartt v. Commissioner, T.C. Memo. 1993-65; see

Putoma Corp. v. Commissioner, 66 T.C. 652, 673 (1976), affd. 601 F.2d 734 (5th Cir. 1979); secs. 1.166-9(a), 1.166-5(b), Income Tax Regs.  Whether the taxpayer is engaged in a trade or business is a question of fact.  United States v. Generes, 405 U.S. 93, 104 (1972); sec. 1.166-5(b), Income Tax Regs.

    2.    Petitioner's Dominant Motive for Guaranteeing Northeast's Line of Credit

        a.    Background and the Parties' Contentions

Whether a guaranty is proximately related to the taxpayer's trade or business depends on the taxpayer's dominant motive for becoming a guarantor when he or she made the guaranty.  United States v. Generes, supra at 104; Harsha v. United States, 590 F.2d 884, 886-887 (10th Cir. 1979).  When a guarantor of a corporate debt is a shareholder and employee of the corporation, mixed motives for the guaranty are usually present; the critical fact is which motive is dominant.  United States v. Generes, supra at 100.  A motive is related to a trade or business when the guarantor aims to increase or protect his or her salary from the trade or business.  A motive is related to an investment when the guarantor aims to increase or protect the value of his or her stock in the debtor corporation.  Whipple v. Commissioner, 373 U.S. 193, 202 (1963).  Petitioner has the burden of proving that his dominant motive in signing the guaranty was business related rather than investment related.  United States v. Generes, supra at 103; Estate of Mann v. United States, 731 F.2d 267, 273 n.8 (5th Cir. 1984); Miles Prod. Co. v. Commissioner, 457 F.2d 1150,

1154 (5th Cir. 1972), affg. T.C. Memo. 1969-274. Objective facts weigh more heavily than the guarantor's statements of intent in ascertaining his or her motive. Kelson v. United States, 503 F.2d 1291, 1293 (10th Cir. 1974).

Petitioners contend that they may deduct $750,000 as a bad debt for payments petitioner made to settle claims against him as guarantor of loans the bank made to Northeast. Petitioners argue that petitioner's dominant motive in guaranteeing the debt was to secure or protect his trade or business of being an employee of Northeast and his employability and reputation in the newsprint industry rather than to protect his investment in Northeast. Respondent contends that petitioner provided the guaranty primarily to protect his investment in Northeast.

b.   Whether Petitioner's Dominant Motive for the Guaranty Was To Benefit His Trade or Business or To Protect His Investment in Northeast

Northeast paid no salary to petitioner in 1979. He guaranteed the $1.2 million line of credit to Northeast on January 11, 1980, about the time that he estimated that his investment in Northeast as a going concern was worth $1 million. We think petitioner's willingness to work 25 hours a week for Northeast for no salary shows that he wanted capital appreciation from Northeast, not income.

Petitioner argues that he guaranteed Northeast's line of credit so that it would continue to operate, and that he would have been substantially compensated by Sigma for work he was

doing for Northeast. Petitioner did not show why his guaranty of Northeast's line of credit enhanced his ability to earn a salary. Northeast paid him no salary, and petitioner did not show why Sigma could or would pay him a salary because of his guaranty. Sigma was sometimes a customer of Northeast, but the record does not show that Sigma depended on Northeast to the extent that Sigma should expend funds to ensure that Northeast survived.

Petitioners argue that it would not have been reasonable for petitioner to guarantee a $1.2 million line of credit to protect a $4,000 cash investment. Petitioner cites three cases in which courts have held that the dominant motive of a taxpayer who personally guaranteed a loan to a company that far exceeded his investment in the company was not to protect his investment: Litwin v. United States, 983 F.2d 997 (10th Cir. 1993); Smith v. Commissioner, T.C. Memo. 1994-640; Estate of Allen v. Commissioner, T.C. Memo. 1982-303. Petitioners' reliance on those cases is misplaced. Petitioner thought his interest in Northeast was worth $1 million when he signed the guarantee, which was almost as much as the line of credit he coguaranteed with McKee. He was drawing no salary from Northeast. We believe he guaranteed the line of credit to protect his investment in Northeast, not to protect his job or salary.

Petitioners argue that petitioner made the settlement payment to reestablish his reputation in the paper and printing industry so that he could continue to earn money from it.

Petitioners' argument misses the mark. We consider whether a taxpayer's dominant motive in becoming a guarantor is proximately related to his or her trade or business at the time of the guaranty rather than when a payment in discharge is made. United States v. Generes, supra at 104; Harsha v. United States, supra. Thus, we do not consider petitioner's motive when he made the settlement payment.

Petitioners cite Syracuse v. Commissioner, T.C. Memo. 1981-340. In Syracuse, we held that a debt is a business debt if the dominant motive for creating or acquiring it is to benefit the lender's trade or business. Petitioners' reliance on Syracuse is misplaced. The taxpayer in Syracuse lent money to another business to benefit his own business. We found that the taxpayer in Syracuse was in the landfill business and not merely investigating and preparing to enter the business when he lent the money. Unlike the taxpayer in Syracuse who lent money to benefit his trade or business, petitioner did not guarantee Northeast's line of credit to enhance his trade or business.

c.    Conclusion

Petitioner's dominant motive for guaranteeing the bank line of credit to Northeast was to enhance his investment in Northeast, not his trade or business. Thus, petitioners may not

deduct as a business bad debt that part of the settlement payment attributable to petitioner's guaranty.

    3.    <u>Whether Petitioners May Deduct the Settlement Payment under Section 162</u>

Petitioners argue in the alternative that they may deduct under section 162 their payments to settle the Northeast litigation and the adversary proceeding.  A taxpayer may deduct ordinary and necessary expenses paid or incurred in carrying on a trade or business.  Sec. 162(a).  Petitioners argue that <u>O'Malley v. Commissioner</u>, 91 T.C. 352, 361-362 (1988), supports their contention that they may deduct the settlement payment since they paid it to settle an action against petitioner that proximately resulted from his business activity.  We agree as to the portion of the settlement not allocable to the guaranty because bad debts cannot be deducted under section 162.  See <u>Horne v. Commissioner</u>, 59 T.C. 319, 336 (1972), affd. 523 F.2d 1363 (9th Cir. 1975); <u>Smith v. Commissioner</u>, 55 T.C. 260, 267 (1970), vacated on other grounds and remanded 457 F.2d 797 (5th Cir. 1972) (section 162 does not apply to debts resulting from a taxpayer's loan guaranty).  The taxpayer in <u>O'Malley</u> made payments which were directly connected with his trade or business as an employee of a trucking company.  Similarly, petitioner's payment to settle claims brought against him by Northeast's creditors other than the bank originated in petitioner's conduct of his duties as an

officer or employee of Northeast and in action taken by him as an investor-shareholder of Northeast; they did not relate to petitioner's guaranty of other debts.

Respondent argues that, under section 263(a), petitioner may not currently deduct the settlement payment because the plaintiffs in the Northeast litigation alleged that he misappropriated both tangible and intangible property. We disagree. The creditors' claims against petitioner arose in the ordinary course of their business with Northeast, not in the process of acquiring or disputing who had title to a capital asset. In defending against the claims, petitioner was not defending or perfecting his title to property. See Cruttenden v. Commissioner, 644 F.2d 1368, 1372-1374 (9th Cir. 1981), affg. 70 T.C. 191 (1978); Boagni v. Commissioner, 59 T.C. 708, 711-712 (1973).

Respondent argues that petitioners may not deduct the settlement payment as an ordinary and necessary expense because the plaintiffs in those cases alleged that petitioner embezzled from Northeast. We disagree. Zayre, CNI, and the other creditors' allegations that petitioner had embezzled funds were a small part of the Northeast litigation. Petitioner denied and defended against these allegations. Petitioner did not admit that those allegations were correct as part of the settlement or

otherwise. He settled the Northeast litigation to repay Northeast's creditors (Zayre and CNI) for debts Northeast incurred in the ordinary course of its trade or business and to settle the bank's claim against him as a guarantor for Northeast. We conclude that petitioner's payment to Northeast's creditors other than his payment for the guaranty was an ordinary and necessary expense.

The claims brought against petitioner for actions he took while he was an officer of Northeast and the allegations in the adversary proceeding originated in petitioner's conduct of his duties as an officer and employee of Northeast. The settlement payment reasonably and proximately related to his serving as an officer of Northeast. Petitioner's payment to settle claims other than that relating to his guaranty to the bank was a trade or business expense. Thus, petitioners may deduct under section 162 that part of the payment petitioner made in the Northeast litigation and adversary proceeding to settle the claims of Northeast's creditors other than his payment for the guaranty. O'Malley v. Commissioner, supra.

A taxpayer may deduct a payment relating to his or her trade or business of being a corporate employee even though the taxpayer made the payment 3 years after the corporation stopped operating. Ostrom v. Commissioner, 77 T.C. 608, 613 (1981).

Thus, even though Northeast had stopped doing business several years before petitioner made the payments, petitioners may deduct part of the settlement payment relating to petitioner's conduct of his duties as an officer and employee of Northeast under section 162 and relating to actions taken by him as an investor-shareholder under section 212. However, petitioners' deduction is limited by section 67, under which expenses are deductible to the extent that they exceed 2 percent of the taxpayer's adjusted gross income.

4.    Allocation of Settlement Payment Between Guaranty and Other Creditors' Claims

We apportion petitioner's $750,000 settlement payment between the claims of the bank relating to petitioner's guaranty of Northeast's line of credit and the claims of Northeast's other creditors. The $750,000 was not all paid on the guaranty because, when the complaint was filed, Northeast owed only $561,530 to the bank. Northeast's nominee had already collected at least $726,000 on Northeast's debts when Northeast's creditors agreed to allocate recoveries. Under that agreement,[4] the bank could recover no more than $375,000 (50 percent of $750,000). We hold that petitioner may deduct 50 percent of the settlement payment for the claims of Northeast's creditors other than the bank, but must treat as a short-term capital loss 50 percent of

---

[4] The creditors' agreement provided that the bank would receive the first $200,000 collected by Northeast's nominee, and 50 percent of any other money collected. Northeast's nominee collected at least $726,000, of which the bank presumably received the first $200,000.

the payment for the claims of the bank relating to petitioner's guaranty.

B.    Whether Petitioners May Deduct Their Legal Fees

Petitioners paid legal fees of $10,243 in 1986, $59,352 in 1987, and $104,156 in 1988 and deducted them on Schedules C of their tax returns.  Respondent determined and contends that petitioners may not deduct $25,269 in 1987 and $33,313 in 1988 of these fees as ordinary and necessary business expenses under section 162 because petitioner paid them in connection with his bankruptcy.  Respondent also determined that legal fees of $10,243 in 1986, $34,083 in 1987, and $70,843 in 1988 were deductible from adjusted gross income subject to the limitations of section 67, which allows miscellaneous itemized deductions to the extent that they exceed 2 percent of adjusted gross income. Petitioners argue that they may deduct the legal fees relating to their bankruptcy because it resulted from Northeast's business failure.

Petitioners may deduct legal expenses if the origin of the claims in the Northeast and adversary proceedings related to petitioner's trade or business or the production of income and was not primarily personal.  Woodward v. Commissioner, 397 U.S. 572, 577-578 (1970); Commissioner v. Tellier, 383 U.S. 687, 689 (1966); United States v. Gilmore, 372 U.S. 39 (1963).  The origin of the claim is found by analyzing the facts, United States v. Gilmore, supra at 47-48, and the basis of the transaction out of

which the litigation arose. Boagni v. Commissioner, supra at 713.

Respondent argues that the legal fees relating to petitioner's bankruptcy were nondeductible personal expenses. Sec. 262. Respondent also argues that petitioners may not deduct attorney's fees related to the adversary proceeding because they involved a challenge to petitioner's discharge for alleged prepetition fraudulent conveyances. See In re Collins, 26 F.3d 116 (11th Cir. 1994). In Collins, the U.S. Court of Appeals for the Eleventh Circuit held that a debtor could not deduct a settlement payment and attorney fees resulting from a bankruptcy trustee's challenge to the debtor's prepetition transfers to a family trust in connection with the debtor's prior bankruptcy case because the payments did not arise from the debtor's income-producing activities.

We disagree with respondent's contention that Collins controls here. The origin of the claim is not necessarily established by allegations made to support a claim. Peters, Gamm, West & Vincent, Inc. v. Commissioner, T.C. Memo. 1996-186. The origin of the claim in this case was petitioner's liability for the debts of Northeast, not the allegation that petitioner committed fraud. Unlike the taxpayer in Collins, petitioner paid the legal fees in dispute to defend against the claims of his creditors in the Northeast litigation who opposed his discharge in bankruptcy; as discussed above at paragraph II-A-3, the claims

of petitioner's creditors, other than the bank, arose from his income-producing activities.

Respondent argues that petitioners' reliance on Dowd v. Commissioner, 68 T.C. 294 (1977), is misplaced. We disagree. In Dowd, we applied the origin of the claim doctrine in deciding whether legal expenses of a bankrupt taxpayer were deductible under section 162(a). The taxpayer in that case filed a petition in bankruptcy resulting primarily from his inability to repay more than $400,000 of business-related debts. The taxpayer incurred court costs and litigation expenses to resolve a dispute with his creditors under which he agreed to pay some of their claims and they agreed not to oppose his discharge in bankruptcy. We held that the taxpayer could deduct litigation expenses to the extent that the creditors' claims were business related. See Cox v. Commissioner, T.C. Memo. 1981-552 (taxpayers could deduct bankruptcy legal expenses attributable to their business since their bankruptcy was proximately caused by their inability to pay the debts of their business).

Petitioner's bankruptcy legal expenses were attributable to his business or investment since Northeast's failure forced him to seek bankruptcy protection. The debts listed in his bankruptcy petition related almost exclusively to Northeast. The plaintiffs in the adversary proceeding were creditors of Northeast. Fees paid to file petitioner's bankruptcy petition and legal fees paid to defend claims against petitioner in the

adversary proceeding had their origin in petitioner's conduct as an employee and investor-shareholder of Northeast and thus related to activities engaged in by petitioner to produce income. Secs. 162, 212(1).  We hold that petitioners may deduct their legal fees in 1986, 1987, and 1988 relating to petitioner's Northeast litigation and adversary proceeding subject to the limits of section 67.

Decision will be entered under Rule 155.