**FLOOD et al. v. UNITED STATES.**
No. 3816.

Circuit Court of Appeals, First Circuit.

Jan. 29, 1943.

Philip Nichols, of Boston, Mass. (J. A. Boyer and Nichols, Boyer & Morton, all of Boston, Mass., of counsel), for appellants.

Newton K. Fox, Sp. Asst. to Atty. Gen., (Samuel O. Clark, Jr., Asst. Atty. Gen., Sewall Key, A. F. Prescott, and Eugene E. Angevine, Sp. Assts. to Atty. Gen., and Edmund J. Brandon, U. S. Atty., and George F. Garrity, Asst. U. S. Atty., both of Boston, Mass., of counsel), for appellee.

Before MAGRUDER, MAHONEY, and WOODBURY, Circuit Judges.

MAGRUDER, Circuit Judge.

This consolidated appeal brings up three related cases which were tried and decided together by the court below. D. C., 44 F.Supp. 509. In one, plaintiff-appellant Flood sued to recover an alleged overpayment of income taxes for the year 1936 in the sum of $3,500. In another, he sought recovery of a similar alleged overpayment for the year 1937 in the sum of $3,110. In the third the executor of John Moir, deceased, sued to recover an overpayment of income taxes in the sum of $5,976.49 for the period January 1, 1938, to September 20, 1938, the date of decedent's death. Judgment was rendered in favor of the defendant in each case.

The basic questions to be decided are these: (1) Whether the income of a trust known as the Chase & Sanborn Pension Fund is taxable to the grantors in proportion to their respective contributions to the corpus, under the identical provisions of §§ 166 and 167 of the Revenue Acts of 1936 and 1938, 49 Stat. 1707, 1708, 52 Stat. 519, 26 U.S.C.A.Int.Rev. Code §§ 166, 167 [1]; (2) if the income is

---

1 "§ 166. Revocable trusts

"Where at any time the power to revest in the grantor title to any part of the corpus of the trust is vested—

"(1) in the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom, or

"(2) in any person not having a substantial adverse interest in the disposition of such part of the corpus or the income therefrom,

then the income of such part of the trust shall be included in computing the net income of the grantor.

"§ 167. Income for benefit of grantor

"(a) Where any part of the income of a trust—

"(1) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be,

held or accumulated for future distribution to the grantor; or

"(2) may, in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income, be distributed to the grantor; or

"(3) is, or in the discretion of the grantor or of any person not having a substantial adverse interest in the disposition of such part of the income may be, applied to the payment of premiums upon policies of insurance on the life of the grantor (except policies of insurance irrevocably payable for the purposes and in the manner specified in section 23(o), relating to the so-called 'charitable contribution' deduction);

then such part of the income of the trust shall be included in computing the net income of the grantor.

"(b) As used in this section the term 'in the discretion of the grantor' means

so taxable, whether, under § 23(a) of the said revenue acts, 49 Stat. 1658, 1659, 52 Stat. 460, 26 U.S.C.A. Int.Rev.Code § 23 (a) (1),[2] the grantors were entitled to take proportionate deductions in their individual returns for so much of the trust income as was paid in the taxable years to former employees of a dissolved partnership of which the grantors had been members.

The partnership of Chase & Sanborn was formed in 1878 and thereafter was continuously engaged until July 16, 1929 in the business of importing and jobbing tea and coffee. On the latter date the partners were John Moir, William T. Rich, Frederick A. Flood and five other individuals. For a considerable period prior to 1929 it had been the regular practice of the partnership through the voluntary action of the partners to provide pensions or allowances of extra compensation to employees who had served the firm long and faithfully and who for reasons of age or ill health had become partially or completely incapacitated. This had been done as a matter of moral, rather than legal, obligation. The firm had at that time between 400 and 500 employees.

On July 16, 1929 the business of the partnership was sold as a going concern to Standard Brands, Inc. The sale included all the assets of the partnership and the buyer assumed all its liabilities except a few minor obligations, which the partners took over. The partnership was not formally dissolved after the sale, but it did no further merchandising. It continued to exist only for the purpose of cleaning up expenses connected with the sale, e. g., attorneys' fees and transfer taxes, and of adjusting the obligations which Standard Brands, Inc., did not assume.

During negotiations leading up to the sale it was proposed that Standard Brands, Inc., should undertake to continue the policy of pensioning the old employees. Standard Brands, Inc. declined to undertake any such responsibility. In consequence, the partners agreed among themselves in advance of the sale that each should contribute a certain portion of his share of the purchase price to be paid by Standard Brands, Inc., to be held in trust for the purpose of paying pensions or allowances to former employees of Chase & Sanborn.

A trust agreement was executed by all the partners on July 16, 1929, creating the Chase & Sanborn Pension Fund. The corpus consisted of shares of first preferred stock in Standard Brands, Inc., of an approximate value of $800,000, contributed by the partners in proportion to their respective interests in the partnership. Moir, Rich and the Day Trust Company became the trustees, and remained as such during the periods now involved. Moir and Rich were the two partners owning the largest partnership interests, 36.63 per cent and 18.78 per cent, respectively.

The trustees were given broad powers of management and were directed to pay the income of the trust to numerous employee beneficiaries named in schedules attached, in monthly payments of varying amounts, ranging at first from $30 to $200 a month. The amounts were determined with reference mainly to the type of service which had been performed by the employee and the pay previously earned, the more valuable and higher salaried men receiving larger pensions. Names were added to the list in subsequent years, in some cases to provide for old employees of the partnership who had continued for a time in the employ of Standard Brands, Inc., and who were later retired, and in a few cases to provide payments to widows of deceased employees who had worked for the partnership. It was provided that upon the death of the last survivor of the beneficiaries named in the schedules the trustees should then pay to the contributors of the fund in proportion to their contributions, or to their legal representatives, the principal as it then should be,

'in the discretion of the grantor, either alone or in conjunction with any person not having a substantial adverse interest in the disposition of the part of the income in question.'"

2 "§ 23. Deductions from gross income. "In computing net income there shall be allowed as deductions:

"(a) Expenses. All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *."

with any accrued income, the trust thereupon to terminate.

Most of the income of the trust in the years now in question was actually paid to the beneficiaries.

In their original returns for the taxable years each of the taxpayers included in his gross income so much of the income of the trust as was attributable to his proportionate contribution to the fund. The taxes were paid accordingly. Claims for refund were filed on the contention that the income of the Chase & Sanborn Pension Fund was not legally taxable to the grantors and, in the alternative, that if the grantors were required to include in their gross income the income of the trust, they were entitled to deduct as business expenses, on their individual returns, their respective portions of the income of the trust which was actually paid to the employee beneficiaries. The court below ruled against the taxpayers on both of these points.

For the purpose of considering the taxability of the grantors under §§ 166 and 167 it is not necessary to quote in detail the provisions of the trust instrument. It is conceded by the taxpayers that "the powers of amendment and modification and the degree of control of payments from income provided by this instrument and vested in the three trustees acting unanimously, when considered together, are the full equivalent of a power of revocation and of a power to hold income for, or distribute it to, the eight grantors." With respect to the taxpayer Flood, the point in dispute is whether Moir and Rich, who under the terms of the trust would have to concur in a revocation or in the accumulation of the income for future distribution to the grantors, were persons not having a "substantial adverse interest" within the meaning of §§ 166 and 167. With respect to the taxpayer Moir the question in dispute is whether Rich was a person not having a substantial adverse interest. The corporate trustee, though its concurrence also was necessary, had an interest which

was neither substantial nor adverse. Treas. Regs. 94, Art. 167–1(b) (3).

 It is urged by the taxpayers that the legal power which Moir and Rich held under the trust instrument, whereby they could compel the continued application of the income to the discharge of what they regarded as their moral obligation to the former employees of the partnership, constituted a substantial interest in the disposition of the corpus or income therefrom adverse to revocation. Significance is attached to a change in the phraseology of §§ 166 and 167 introduced by the Revenue Act of 1932, 26 U.S.C.A. Int.Rev.Code §§ 166, 167. Under the 1928 act, 45 Stat. 840, 26 U.S.C.A. Int.Rev.Acts, page 407, the income of a trust was taxable to the grantor if he had the described powers "either alone or in conjunction with any person not a beneficiary of the trust." In the 1932 act, 47 Stat. 221, and subsequent acts, in place of the words "beneficiary of the trust" there is substituted the phrase "person not having a substantial adverse interest in the disposition" of the corpus or income. Under this altered language the argument is that a grantor is saved from taxability on the income of a trust not only where the repository of the power is a beneficiary having a substantial property interest in the trust, but also where the power holder has any interest in the disposition of the corpus or income of a sort that should be recognized as giving him "a sufficient and compelling motivation against revocation"; that in any case where such an interest is present the grantor cannot be said to have so retained the substantial mastery over the property which he contributed to the trust as to justify the attribution of the income to him. We think the court below was right in concluding that in amending §§ 166 and 167 in 1932 Congress did not intend to liberalize those provisions in favor of grantors, but on the contrary sought to "tighten rather than loosen the reins." [44 F.Supp. 513.] This is borne out by the report of the Senate Committee on Finance (Sen. Rep. No. 665, 72d Cong., 1st Sess., p. 34).[3]

---

[3] "Under the present law the income of a trust is taxable to the grantor where, at any time during the taxable year, the grantor has power to revest in himself title to any part of the corpus of the trust, either alone or in conjunction with any person not a beneficiary of the trust. In an attempt to avoid this section, the practice has been adopted by some grantors of reserving power to revest title to the trust corpus in conjunction with a beneficiary having a very minor interest or of conferring the power to revest upon a person other than a beneficiary; in such cases the grantor has substantially the same control as if he alone had pow-

It is there pointed out that taxpayers had sought to avoid the effect of § 166 in its earlier form by reserving to the grantor the power of revocation "in conjunction with a beneficiary having a very minor interest" or by "conferring the power to revest upon a person other than a beneficiary." The report makes clear that under the amendments the income is to be taxable to the grantor "in any of these cases," including the case where the grantor reserves in himself no formal power of revocation but confers such power "upon a person other than a beneficiary."

■ No doubt, in a particular case, the repository of the power might in fact have a strong personal motive for standing out against a revocation of the trust, even though he had no property interest as a beneficiary thereunder. Thus, in Commissioner v. Prouty, 1 Cir., 1940, 115 F.2d 331, 335, 133 A.L.R. 977, under the trust instrument the corpus was to go to the children of the holder of the power upon his death. Quite possibly he might, as parent, have felt a compelling moral obligation to resist a revocation which would cut out his children. We held, however, that he did not have a substantial adverse interest within the meaning of the statute. It would seem to be quite impracticable to make the question of taxability to the grantor depend upon an inquiry in each case as to the actual state of mind of the repository of the power during the taxable years. To prevent tax avoidance, Congress has prescribed a general rule, on the reasonable assumption that more often than not the vesting of the power in a person who has no property interest as a beneficiary of the trust would enable the grantor to retain the substantial mastery over the corpus or income. We do not doubt that Congress may constitutionally do this. In Helvering v. City Bank Farmers Trust Co., 1935, 296 U.S. 85, 90, 56 S.Ct. 70, 73, 80 L.Ed. 62, the court said:

"Congress may adopt a measure reasonably calculated to prevent avoidance of a tax. The test of validity in respect of due process of law is whether the means adopted is appropriate to the end. A legislative declaration that a status of the taxpayer's creation shall, in the application of the tax, be deemed the equivalent of another status falling normally within the scope of the taxing power, if reasonably requisite to prevent evasion, does not take property without due process."

■ With the foregoing considerations in mind we said in the Prouty case, supra, 115 F.2d at page 335, "But we think the phrase 'substantial adverse interest,' * * * means a direct legal or equitable interest in the trust property, and not merely a sentimental or parental interest in seeing the trust fulfilled for the advantage of other beneficiaries", citing Loeb v. Commissioner, 2 Cir., 1940, 113 F.2d 664, 666, 132 A.L.R. 781.

■ But if we are wrong in this, still the taxpayer's argument cannot prevail. If the interest of Moir and Rich in the continued application of the income to the discharge of their moral obligation to their former employees is deemed to be an "adverse interest," that is, an interest adverse to revocation, within the meaning of the statute, the substantiality of this interest as a compelling motivation against revocation cannot be determined without taking into account a countervailing interest of Moir and Rich which would be served by revocation. See Welch v. Bradley, 1 Cir., 1942, 130 F.2d 109. Here, a revocation of the trust would bring back to Moir and Rich the possession and enjoyment of the substantial fortunes which they had contributed to the trust. Under these circumstances we cannot conclude that the court

---

er to revoke the trust. While it is, of course, yet to be established that such device accomplishes its purpose, it is considered expedient to make it clear that in any of these cases the income shall be taxed to the grantor. The House bill made the grantor of a trust taxable upon the income of any part of the corpus of the trust, where the power to revest in the grantor title to such part of the corpus was in the grantor alone or was in the grantor in conjunction with any person not having a substantial adverse interest in the disposition of such part of

the corpus. Your committee has extended the scope of this provision so as to include, as well, the cases where the power to revest title to any part of the corpus is held, either alone or in conjunction with the grantor, by a person not having a substantial adverse interest in such part of the corpus or in the income therefrom."

See also House Rep. No. 708, 72d Cong., 1st Sess., p. 25, and House Conference Report No. 1492, 72d Cong., 1st Sess., p. 16.

below was in error in determining that Moir and Rich did not have substantial adverse interests within the meaning of the statute.

As to the second point in the case, though the matter is not free from doubt we think that the District Court erred in holding that the taxpayers were not entitled under § 23(a) to deduct on their individual returns their respective portions of the income of the trust which was actually paid to the beneficiaries.

■ Clearly while the partnership of Chase & Sanborn was carrying on business, payments of the sort here in question were deductible in computing the net income of the partnership. Employers making payments (reasonable in amount) of bonuses to employees or of pensions to retired employees, in the nature of extra compensation for past services, may deduct such payments as "ordinary and necessary expenses" of the business. Lucas v. Ox Fibre Brush Co., 1930, 281 U.S. 115, 50 S.Ct. 273, 74 L.Ed. 733. Conversely, the recipients of such payments are taxable on them; they are not treated as gifts. Noel v. Parrott, 4 Cir., 1926, 15 F.2d 669; Weagant v. Bowers, 2 Cir., 1932, 57 F.2d 679; Fisher v. Commissioner, 2 Cir., 1932, 59 F.2d 192; Levey v. Helvering, 1933, 62 App.D.C. 354, 68 F.2d 401; Botchford v. Commissioner, 9 Cir., 1936, 81 F.2d 914; Poorman v. Commissioner, 9 Cir., 131 F.2d 946, decided Dec. 4, 1942. It is not fatal to deductibility that the employer was not legally obligated to make such payments. See the cases above cited; also Old Colony Trust Co. v. Commissioner, 1929, 279 U.S. 716, 730, 49 S.Ct. 499, 73 L.Ed. 918. The District Court made no specific finding that the pension payments to the retired employees, when added to the stipulated salaries formerly paid, did not exceed a reasonable compensation for the past services rendered. But the facts in the record would clearly warrant such a finding, and the court apparently thought such was the fact, for it stated: "It is probably true that the nature of these payments is such that they would be deductible from gross income as ordinary and necessary expenses if the plaintiffs were engaged in 'carrying on any trade or business' during the year these payments were paid or incurred."

The Government's argument, accepted by the court below, is that the deductions must be denied because the payments in question were neither paid nor incurred in taxable years during which the taxpayers were engaged in business.

■ As we read § 23(a), its meaning may be stated in elaborated paraphrase, as follows: "All ordinary and necessary expenses directly connected with or proximately resulting from carrying on any trade or business, paid (if the taxpayer is on a cash basis) or incurred (if the taxpayer is on an accrual basis) during the taxable year, including a reasonable allowance for salaries or other compensation for personal services actually rendered; * * *" It was, of course, an ordinary and necessary expense for the partnership of Chase & Sanborn to hire the employees needed for the carrying on of its business. That was an expense directly connected with the operation of the business. During the taxable years the former employees were paid pensions by way of extra compensation for the past services they had rendered while the business was being carried on. The fact that these payments were not pursuant to a legal obligation seems to be no more significant here than in the case of the payments which had been made to retired employees while the business was still being carried on. Certainly, the expenses need not necessarily be "paid" while the business is being carried on. Burnet v. Marston, 1932, 61 App. D.C. 91, 57 F.2d 611; Waters F. Burrows, v. Com'r, 1938, 38 B.T.A. 236. See Kornhauser v. United States, 1928, 276 U.S. 145, 48 S.Ct. 219, 72 L.Ed. 505. And § 23(a) can hardly be read as requiring that a legal obligation to make the payment must have been "incurred" while the business was being carried on. If it were so construed a deduction would have to be disallowed in this case: A man retires from business in 1940. Two years later he is sued on an alleged tort liability arising out of the conduct of the business. In 1942 he incurs and pays the expense of engaging a lawyer to defend the suit. The expense proximately resulted from carrying on the business and the payment of counsel fees ought to be deductible in 1942 as an ordinary and necessary expense. See Kornhauser v. United States, 1928, 276 U.S. 145, 153, 48 S.Ct. 219, 72 L.Ed. 505.

The Treasury regulations are entirely consistent with the view we take. Art. 23 (a)-1, Regulations 94, provides: "Business expenses deductible from gross in-

come include the ordinary and necessary expenditures directly connected with or pertaining to the taxpayer's trade or business. * * *" Art. 23(a)-9 provides: "Amounts paid by a taxpayer for pensions to retired employees or to their families or others dependent upon them, * * * are proper deductions as ordinary and necessary expenses." Cole v. Commissioner, 1930, 19 B.T.A. 251, which seems to hold that pensions are deductible only if "paid by a going business" introduces a limitation which we do not find either in the statute or in the regulation. So far as we can find, it is the only case so holding, and for the reasons stated we think we ought not to follow it.

If we are right thus far, then Chase & Sanborn in 1929 might have proceeded in a different way to maintain its pension policy, with the privilege of taking the deduction. It might have withheld from immediate distribution to the partners $800,000 of the purchase price received from Standard Brands, Inc. and used the income therefrom to make the payments to the retired employees. The partnership would then have filed information returns in the taxable years in question, computing the net income distributable to the partners by deducting from the dividends received on the $800,000 of Standard Brands stock the amounts paid as extra compensation to the retired employees.[4] The partners would have taken into their own individual returns only their proportionate shares of net income so computed and thus would have got the benefit of the deduction.

Instead of proceeding in this way, the partners decided that the partnership should be liquidated forthwith, that complete distribution should be made to the partners, that the partners should assume, pro rata, the moral obligation of the firm to its former employees, and that the discharge of this obligation should be effectuated by the device of the Chase & Sanborn Pension Fund, to which the partners were to make contributions in proportion to their respective interests in the partnership. There is no reason why this difference in the mere form of the transaction should result in depriving the partners of the benefit of the deduction under § 23(a). The nature of the payments to the former employees was the same, though the mechanism for making the payments was changed after the partnership was dissolved. The revenue acts do not regard a partnership as a separate taxable entity. Though as a matter of accounting convenience the partnership files an information return, the tax is assessed upon the individual partners. "The tax law adopts the entity concept as a skin deep accounting expediency, but the framework is that of the individual partner's profit and loss." Rabkin and Johnson, The Partnership under the Federal Tax Laws, 55 Harv.L.Rev. 909, 915 (1942). Since the partnership of Chase & Sanborn was dissolved in 1929 and its affairs completely and finally wound up, there was no occasion for the partnership to file an information return for later years. The partners were thereafter entitled to take a deduction on their individual returns for their respective shares of the pension payments made to the retired employees out of the trust fund which they set up as a means of honoring their individual assumption of the firm's moral obligation to its faithful employees.

The judgments of the District Court are vacated and the case is remanded to that court for further proceedings not inconsistent with this opinion.

---

[4] The Government cites Higgins v. Commissioner, 1941, 312 U.S. 212, 61 S. Ct. 475, 85 L.Ed. 783, for the proposition that collecting dividends on the stock and paying pensions to the beneficiaries would not constitute "carrying on any trade or business" within the meaning of § 23(a). This is no doubt true. But this is not to say that a deduction should be disallowed for payment of an expense directly connected with the former business of importing and jobbing tea and coffee.