T.C. Memo. 2003-295

UNITED STATES TAX COURT

HORACE D'ANGELO, JR., Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 8049-01.                    Filed October 23, 2003.

Neal Nusholtz, for petitioner.

Gregory C. Okwuosah, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LARO, Judge:  Petitioner petitioned the Court to redetermine deficiencies of $35,742 and $26,756 in his 1995 and 1996 Federal income taxes, respectively.  Following concessions,[1] we decide:

_____

[1] In addition to the explicit concessions, we consider petitioner to have conceded respondent's determination that he is entitled to deduct certain prepaid expenses in 1996, not in 1995.
(continued...)

1.  Whether the notice of deficiency is "arbitrary".  We hold it is not.

2.  Whether petitioner may deduct a forgiven debt in the amount claimed on his 1995 tax return.  We hold he may.

3.  Whether petitioner was personally engaged in the trade or business of developing industrial real estate.  We hold he was.

4.  Whether petitioner may under section 162 deduct certain legal expenses paid by him.[2]  We hold he may.

5.  Whether petitioner may under section 162 or 212 deduct certain office expenses paid by him.  We hold he may not.

FINDINGS OF FACT

Some facts were stipulated.  The stipulated facts and the accompanying exhibits are incorporated herein by this reference.  We find the stipulated facts accordingly.  Petitioner resided in Rochester Hills, Michigan, when the petition was filed.

---

[1](...continued)
Petitioner failed to advance any arguments as to this issue in his brief.  Accordingly, we deem the issue abandoned.  Wilcox v. Commissioner, 848 F.2d 1007, 1008 n.2 (9th Cir. 1988), affg. T.C. Memo. 1987-225; Lunsford v. Commissioner, 117 T.C. 183, 187 (2001); Nicklaus v. Commissioner, 117 T.C. 117, 120 n.4 (2001).

[2] Unless otherwise stated, section references are to the applicable versions of the Internal Revenue Code, Rule references are to the Tax Court Rules of Practice and Procedure, and dollar amounts are rounded to the nearest dollar.

Petitioner's Business Pursuits

Petitioner has been a business associate of Keith Pomeroy (Pomeroy) since the early 1980s. In 1983, he and Pomeroy entered into a Development Agreement (1983 Development Agreement). It provided, in relevant part:

> 1. Purpose. The principal purpose of the Parties acting together is to acquire, hold, develop, operate, and sell various real estate and building projects, primarily, although not exclusively, nursing homes and housing for the elderly. The Parties shall contribute equally funds as are required to acquire, hold, develop, operate and/or sell projects that are subject to this Agreement, and each shall own an undivided one-half interest in such projects. Only those projects will be acquired and developed on which there is unanimous agreement. Either Party may decline to participate in any project for any reason whatsoever. In such case, the other Party may not proceed with such project individually.

Pursuant to the 1983 Development Agreement, petitioner and Pomeroy through the years have organized numerous entities primarily to acquire, develop, manage, and operate commercial real estate. Petitioner directly owned an interest in approximately 21 real-estate-related entities during the subject years and was involved with numerous other entities primarily by virtue of contractual relationships through the entities which he owned. The relevant entities are Arbor Corporation (Arbor), Peachwood Nursing Center (PNC), H.K. Peach, Inc. (H.K. Peach), REH1 Corporation (REH1), TROY-SAK Associates (TROY-SAK), Lakeland

Neuro Care Limited Partnership (Lakeland), and Crittenton Development Center (Crittenton).

Arbor was an S corporation that handled the day-to-day record-keeping and management of the entities owned in whole or in part by petitioner and Pomeroy. Its stock was owned equally by petitioner and Pomeroy until 1996 when Pomeroy transferred all of his stock in Arbor to petitioner in connection with the lawsuits discussed infra. Arbor employed and paid the management staff for the nursing homes that it managed. These management fees were then charged to the nursing home to the benefit of which the services in question inured. Petitioner was Arbor's president and managed its daily affairs.

H.K. Peach was an S corporation owned equally by petitioner and Pomeroy. PNC was a partnership formed for the purpose of leasing certain land and nursing homes constructed thereon. PNC, an accrual basis taxpayer, was owned equally by H.K. Peach and Crittenton. REH1 was an S corporation which owned and operated the industrial real estate properties. REH1 was owned 25 percent by petitioner, 25 percent by Pomeroy, and 50 percent by other unrelated individuals. TROY-SAK was a real estate partnership owned 25 percent by petitioner and 75 percent by Pomeroy and two other individuals whose names are not material to this case. Lakeland was a partnership owned 90 percent by REH1 and 10 percent by an unrelated entity named CMS Lakeland, Inc. Lakeland

was formed for the purposes of owning, developing, leasing, and operating a certain subacute rehabilitation unit. Crittenton was a real estate development entity owned by persons unrelated to petitioner and Pomeroy.

Debt Settlement

Peachwood Center Associates (PCA)[3] owned certain property which it leased to PNC. Beginning in 1989, PNC sublet the property to Lakeland. Shortly thereafter, Lakeland disputed the amount of rent payable under the sublease agreement and declined to pay the amount of that rate. The situation resulted in an arbitration proceeding between Lakeland, on the one hand, and PCA and PNC, on the other hand. The parties to the arbitration proceeding resolved that and at least one other proceeding (the Oakland 2 lawsuit described infra in which PCA and Crittenton sued petitioner, Pomeroy, Arbor, and PNC) through an agreement that included a debt settlement agreement (debt settlement agreement) and a related redemption agreement (redemption agreement).

Pursuant to the debt settlement agreement, dated November 22, 1995, Lakeland agreed to pay PNC $600,000 in settlement of $992,796 of disputed rent that PNC consider owed

---

[3] Peachwood Center Associates was a partnership in which petitioner and Pomeroy each owned a 25-percent interest in 1995 and a 50-percent interest in 1996.

(and had accrued as income) on the sublease. Lakeland agreed to pay $200,000 of the $600,000 immediately and make subsequent annual payments of at least $100,000 until the entire $600,000 (exclusive of interest at the prime rate) was fully discharged. The debt settlement agreement provided:

> Notwithstanding anything contained herein to the contrary, the terms of this Agreement shall be contingent upon the consummation of the contemplated redemption of Crittenton Development Corporation's interest in Peachwood Center Associates and Peachwood Nursing Center. Keith J. Pomeroy and Horace D'Angelo Jr. hereby agree to pursue in good faith the consummation of said redemption on an expeditious basis.

Pursuant to the redemption agreement, dated November 30, 1995, PNC redeemed Crittenton's 50-percent interest for cash. As of that date, PNC terminated for income tax purposes pursuant to section 708(b)(1)(B).

Because of the mandatory redemption of Crittenton and the resulting termination of PNC, PNC and H.K. Peach considered the eliminated debt of $392,796 (the original debt of $992,796 less the settlement amount of $600,000) as a worthless debt that belonged entirely to H.K. Peach. Accordingly, on their respective 1995 tax returns, PNC did not claim a deduction for the eliminated debt, but H.K. Peach did. Petitioner and Pomeroy, each in his capacity as a 50-percent shareholder of H.K. Peach, claimed for 1995 a bad debt deduction of $196,398 (1/2 of $392,796). Respondent in the notice of deficiency issued to

petitioner denied his claim to his 50-percent share of the bad debt deduction.

Legal Expenses

The differences between and among petitioner, Pomeroy, and other investors led to a number of lawsuits (lawsuits). Petitioner personally paid much of the legal fees connected to the lawsuits, and he now claims that he may deduct these fees as the ordinary and necessary expenses of his business, purportedly, the development of industrial real estate. The lawsuits involved defending petitioner's business practices, compelling petitioner's business associates to account for profits, and related issues. The lawsuits were handled mainly by the law firms of Plunkett & Cooney; Williams, Schaefer, Ruby & Williams; and Jacob & Weingarten.

For 1995, petitioner incurred legal expenses in the following proceedings which are at issue in this case: (1) Oakland County Case No. 91-413151-CK (Oakland 1), (2) Oakland County Case No. 89-367018-CB (Oakland 2), and (3) Oakland County Case No. 93-455713 CK (Oakland 3). Oakland 1 was a lawsuit by Arbor against Pomeroy and others, to which petitioner was later added as a cross-plaintiff. The proceeding essentially involved claims of diversion of management fees and breach of fiduciary duty. Oakland 2 was a lawsuit by PCA and Crittenton against petitioner, Pomeroy, Arbor, and PNC. The proceeding generally

involved claims of breach of fiduciary duty, failure to pay rent, and failure to make appropriate partnership contributions. Oakland 3 was a lawsuit in which Pomeroy had accused petitioner of, among other things, taking over H.K. Peach and otherwise breaching his fiduciary duty. With respect to all these proceedings, petitioner claimed in 1995 as a deduction legal fees of $90,392 (relating to Oakland 1 and Oakland 2) and $770 (relating to Oakland 3).

For 1996, petitioner incurred legal expenses in the following proceedings which are at issue in this case: (1) Oakland 1, (2) Oakland 2, (3) Oakland County Case No. 91-413076-CK (Oakland 4), and (4) Oakland County Case No. 93-455889 (Oakland 5). Oakland 4 was a lawsuit where petitioner sued individually and on behalf of REH1 as coplaintiffs. The case included an allegation against Pomeroy and others for a failure to account for profits. Oakland 5 was a lawsuit by Pomeroy and his business partner, whose name is not material to this proceeding, to compel petitioner to turn over his partnership interest in TROY-SAK pursuant to an agreement. In 1996, petitioner claimed as a deduction legal fees of $57,799 (relating to Oakland 1, Oakland 2, Oakland 3, Oakland 4, and Oakland 5).

Respondent maintains that petitioner may not deduct these amounts because he is not engaged in "any trade or business"

within the meaning of section 162(a) and/or because these amounts constitute capital expenditures.

Office Expenses

For 1995, petitioner deducted $14,065 of expenses, which he personally bore after moving the office and the staff of Arbor into a house he owned.  The move was precipitated by disagreements that had arisen between petitioner and Pomeroy. Petitioner and some of the Arbor employees worked in the office. Those employees were a bookkeeper, an administrative assistant, an individual responsible for Medical/Medicaid costing reports, a comptroller, a secretary, and another individual responsible for maintenance, landscaping, computers, and marketing.

The expenses deducted by petitioner included costs of furniture, asphalt repair, water softener, and other items. Respondent asserts that these expenses belong to Arbor and thus cannot be deducted by petitioner personally.  Additionally, respondent maintains that the following items should be capitalized and, if deductible, depreciated:

| Expense | Amount |
| --- | --- |
| Table | $171 |
| Water softener | 188 |
| Asphalt repair | 1,850 |
| Furniture | 338 |

OPINION

I.   <u>Burden of Proof</u>

In general, respondent's determinations are presumed correct, and taxpayers bear the burden of proving them wrong. Rule 142(a)(1); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). As one exception to this rule, section 7491(a) places upon the Commissioner the burden of proof with respect to any factual issue relating to liability for tax if the taxpayer maintained adequate records, satisfied applicable substantiation requirements, cooperated with respondent, and introduced during the court proceeding credible evidence on the factual issue.  A taxpayer such as petitioner must prove that he has satisfied the recordkeeping, substantiation, and cooperation requirements before section 7491(a) places the burden of proof upon the Commissioner.  <u>Prince v. Commissioner</u>, T.C. Memo. 2003-247.

In that the record is sufficient for us to decide this case on its merits based on a preponderance of the evidence, we need not and do not decide which party bears the burden of proof in this case as to the substantive issues.  We note, however, that we disagree with petitioner's assertion that the notice of deficiency is arbitrary because it, unlike a notice of deficiency issued to Pomeroy, did not include or refer to an exhibit that explained the income-adjustment allocations relating to H.K. Peach.  The notice of deficiency at hand correctly identified

petitioner, stated the disallowed amounts and the years to which they pertain, and adequately explained the calculations employed in arriving at them.

II.  Debt Settlement

The parties agree that the $392,796 bad debt deduction resulted from the forgiveness in the debt settlement agreement of that amount of accrued rent and, more specifically, a settlement of the proceedings discussed above.  The parties do not dispute that PNC was entitled to deduct the eliminated debt as a bad debt but challenge only the amount of that deduction allocable to petitioner.

Petitioner argues on brief that the debt was settled after Crittenton's termination and that he, as a 50-percent shareholder of H.K. Peach, is entitled to deduct half ($196,398) of the debt. Petitioner focuses primarily on respondent's reference to the all events test and argues that this test was not met before Crittenton's redemption in that the redemption was a vital term of settlement.  Alternatively, petitioner argues, respondent's earlier resolution of this issue, coupled with respondent's representations to the Court, means that respondent is now estopped from challenging the amount of his deduction in this proceeding.

Respondent argues on brief that the debt was settled before Crittenton's termination.  Thus, respondent concludes, only half

($196,398) of the bad debt flowed through to H.K. Peach (the other half flowing through to Crittenton), and petitioner may deduct only half of that half (in other words, $98,199). Respondent reads PNC's pretermination financial statements to indicate that petitioner, in his capacity as president of Arbor, believed that the debt was settled before Crittenton's (and hence PNC's) termination. In particular, respondent observes, PNC recorded in those statements a $600,000 note receivable that it received from Lakeland in connection with the debt settlement agreement. Respondent makes no mention of the terms of redemption in the debt settlement agreement but considers the reporting of the $600,000 note receivable to be dispositive of this issue.

On the basis of the facts and circumstances of this case, we hold for petitioner. We conclude from our reading of the debt settlement agreement that the $392,796 was not forgiven until after the redemption of Crittenton. The parties to that agreement went to great lengths to memorialize their understanding that this redemption was a condition precedent to the settlement of the debt. Respondent has not alleged that the debt settlement agreement was a sham or that the terms thereof should be disregarded by the Court. We respect the express terms

of the debt settlement agreement and hold for petitioner.[4]  H.K. Peach, PNC's successor, may deduct the entire amount of the eliminated debt, and petitioner, as a 50-percent shareholder of H.K. Peach, may deduct $196,398, or one-half of the entire amount.

III.  Engaged in a Trade or Business

Petitioner argues that his extensive involvement in real estate business ventures places him in a trade or business of developing industrial real estate during the subject years. Respondent maintains that petitioner's involvement with the real estate has always been on behalf of Arbor.  Respondent concludes that petitioner was not personally engaged in a trade or business.  We agree with petitioner.

Petitioner began his real estate career more than 20 years ago.  In 1995 and 1996, he was actively involved in developing the industrial real estate and nursing home businesses, in accordance with the terms of the 1983 Development Agreement. Over the years, petitioner and Pomeroy, alone and sometimes with others, built a number of industrial rental and nursing home rental partnership enterprises.  Petitioner personally ran a substantial part of the operations, supervising Arbor's management activities and the partnerships' rental activities.

---

[4] On the basis of our holding, we need not and do not discuss petitioner's alternative argument.

Petitioner was also in charge of applying for and procuring the licenses necessary to conduct the operations relating to nursing homes within the State of Michigan.

A general partner may be deemed to be conducting the trade or business activity of the partnership in which he or she is a member. Hoffman v. Commissioner, 119 T.C. 140 (2002); see also Flood v. United States, 133 F.2d 173, 179 (1st Cir. 1943); Cokes v. Commissioner, 91 T.C. 222, 228 (1988); Drobny v. Commissioner, 86 T.C. 1326, 1342 (1986); Brannen v. Commissioner, 78 T.C. 471, 504 (1982), affd. 722 F.2d 695 (11th Cir. 1984); Ward v. Commissioner, 20 T.C. 332, 343 (1953), affd. 224 F.2d 547 (9th Cir. 1955). See generally Rev. Rul. 92-17, 1992-1 C.B. 142. Moreover, the trade or business of the partnership may be imputed to a general partner irrespective of the fact that the partner did not actively or materially participate in the partnership. Bauschard v. Commissioner, 31 T.C. 910, 916-917 (1959), affd. 279 F.2d 115 (6th Cir. 1960). Additionally, an individual taxpayer may be engaged in more than one trade or business. Oliver v. Commissioner, 138 F.2d 910 (4th Cir. 1943), affg. a Memorandum Opinion of this Court.

Respondent concedes that petitioner was materially involved in developing the real estate and nursing home businesses. Nevertheless, respondent argues that at all times when petitioner

was so involved, he was acting on behalf of Arbor.  The record as a whole indicates otherwise.

We agree that merely providing services to a corporation to increase its value does not rise to the level of a trade or business other than a trade or business of performing services as an employee.  However, while petitioner did devote substantial time and effort to running the business of Arbor, his activities were not so limited.  Petitioner was actively involved in procuring licenses for operation of nursing homes, selecting location of buildings and their design, and similar engagements.  Moreover, the 1983 Development Agreement attests to the intention of petitioner and Pomeroy to engage in a trade or business of developing "various real estate and building projects, primarily, although not exclusively, nursing homes and housing for the elderly."  The record demonstrates that petitioner fulfilled that intention during the years in question.

A trade or business is a continuous and regular vocation engaged in for profit.  See generally Commissioner v. Groetzinger, 480 U.S. 23 (1987).  According to the record, during the years at issue, petitioner actively carried out the business activities referenced in 1983 Development Agreement.  We find that these activities rose to the level of his own trade or business pursuant to the terms of the 1983 Development Agreement.  See Hoffman v. Commissioner, supra.  We hold that during 1995 and

1996, petitioner was engaged in a trade or business of developing industrial real estate.

IV. Legal Fees

At issue here are professional fees of $770 and $90,392 for 1995, and $57,799 for 1996. These amounts were incurred by petitioner in the course of his participation in several lawsuits in the Oakland County District Court in his capacity as an officer, partner, and/or shareholder of the entities he owned in whole or in part.

Petitioner maintains that these amounts are deductible by him under section 162 as the ordinary and necessary business of his trade or business of developing industrial real estate. Alternatively, petitioner asserts, these amounts are deductible under section 212 as expenses attributable to property held for the production of income. Respondent argues that all of these amounts are nondeductible capital expenditures, except for the portion of legal expenses allocable to Oakland 2.[5] We agree with petitioner.

Section 162(a) allows a deduction for all ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business. To qualify as an allowable deduction under section 162(a), an item must (1) be paid or

_____

[5] The parties stipulated allocating 50 percent of the $90,392 at issue to Oakland 2.

incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense. <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345, 352 (1971). The principal difference between classifying a payment as a deductible expense or a capital expenditure concerns the timing of the taxpayer's recovery of the cost. See <u>INDOPCO, Inc. v. Commissioner</u>, 503 U.S. 79, 83-84 (1992); <u>Interstate Transit Lines v. Commissioner</u>, 319 U.S. 590 (1943); <u>Lychuk v. Commissioner</u>, 116 T.C. 374 (2001); <u>Metrocorp, Inc. v. Commissioner</u>, 116 T.C. 211 (2001).

Just because a particular expense fits within the literal language of section 162, it does not automatically become deductible. This is because other sections, such as section 261, except certain payments from the current deductibility provisions. <u>INDOPCO, Inc. v. Commissioner</u>, <u>supra</u> at 84. Section 261 states that "no deduction shall in any case be allowed in respect of the items specified in this part", e.g., Part IX, Items Not Deductible. Section 263(a)(1), which is contained in Part IX, generally provides that a deduction is not allowed for "Any amount paid out for new buildings or for permanent improvements or betterments made to increase the value of any property or estate."

As we recently noted in <u>Lychuk v. Commissioner</u>, <u>supra</u> at 386, the Supreme Court's mandate as to capitalization requires

that an expenditure be capitalized when it (1) creates a separate and distinct asset, (2) produces a significant future benefit, or (3) is incurred "in connection with" the acquisition of a capital asset.  See also <u>Commissioner v. Idaho Power Co.</u>, 418 U.S. 1, 13 (1974); <u>Woodward v. Commissioner</u>, 397 U.S. 572, 575-576 (1970).  If any of the three conditions is met, an expense may not be deducted and must be capitalized.

Here, the correct legal framework in determining whether the disputed legal fees are deductible is the origin of the claim test.  <u>United States v. Gilmore</u>, 372 U.S. 39 (1963).  In order for these fees to be deductible, the origin of the claim in the underlying action must be proximately related to petitioner's trade or business.  <u>Kornhauser v. United States</u>, 276 U.S. 145 (1928).  The origin of the claim test is factual, and the factors to be considered include:  (1) Allegations in the complaint, (2) the legal issues involved, (3) the nature and objectives of the litigation, (4) the defenses asserted, (5) the purposes for which the amounts claimed as deductible were expended, and (6) the background of litigation and all facts pertaining to the controversy.  <u>Boagni v. Commissioner</u>, 59 T.C. 708, 713 (1973).

The first disputed fee, $770, relates to Oakland 3.  The complaint by Pomeroy in this case alleged that petitioner, in his capacity as president of H.K. Peach, had seized control of the corporation and had operated the corporation "as his private

fiefdom," to the exclusion of Pomeroy.  The complaint alleged further that petitioner, in his capacity as a director, officer, and shareholder of H.K. Peach, "has engaged in a course of action constituting illegal, fraudulent, willfully unfair and oppressive acts", including the establishment of certain bank accounts, purportedly authorized by the board of directors of H.K. Peach, the fact of which authorization was denied by Pomeroy.  Remedies sought by Pomeroy included attorney's fees, "appropriate damages", recovery of the misappropriated funds on behalf of H.K. Peach, and dissolution and liquidation of the assets and business of H.K. Peach.

Applying the test of Commissioner v. Lincoln Sav. & Loan Association, supra, we find that this fee (1) was paid or incurred during 1995, (2) was incurred in connection with carrying on petitioner's trade or business, (3) was an expense, (4) was a necessary expense in that petitioner was required to defend himself in a lawsuit, and (5) was an ordinary expense in that litigation expenses commonly arise in the course of conducting business. Therefore, petitioner may deduct the fee in question if no other limitations, such as section 263, indicate that capitalization is required.

The "origin of the claim" test yields the same result.  In Oakland 3, the origin of the claim was Pomeroy's allegations that petitioner had breached his fiduciary duty and mismanaged the

entities.  Petitioner's defense was no more than an attempt to preserve the status quo; namely, to defend his business practices against those allegations and to preserve his already established position within H.K. Peach.  Petitioner did not attempt to create a separate or distinct asset, produce a significant future benefit, or acquire a capital asset.  See Lychuk v. Commissioner, supra.  To the extent that any benefit was created by virtue of petitioner's defending this lawsuit, it appears to us more immediate than future, in that an imminent harm to petitioner would ensue if he failed to defend himself in this proceeding.

Respondent relies exclusively on Lin v. Commissioner, T.C. Memo. 1984-581, to support his assertion that these fees must be capitalized.  There, the legal fees related to two proceedings. The first proceeding concerned a dispute as to the ownership and management of two corporations.  The second proceeding concerned a dispute to set aside a deed as fraudulent and void.  The Court concluded that the origin of the claim in the first proceeding was to "protect or defend * * *[the taxpayers'] proportionate interest in the ownership of the stock of the corporations", and in the second proceeding was to restore and establish the taxpayers' right to the ownership of the property in question. We find Lin distinguishable on its facts and hold that the legal fees related to Oakland 3 are deductible as ordinary and

necessary business expenses incurred in the course of petitioner's trade or business.

The second portion of the disputed legal expenses, $90,392, was incurred by petitioner with respect to Oakland 1 and Oakland 2. Oakland 1 was brought against Pomeroy and others, and involved claims of diversion of Arbor funds to Pomeroy's own management company, failure to pay to Arbor the management fees to which it was entitled, and breach of fiduciary duty. The remedies sought in that proceeding included restitution and exemplary damages. Claims in Oakland 2 focused on the alleged breach of fiduciary duty by petitioner and Pomeroy, and their purported financial manipulation of Crittenton through "corporate instrumentalities" which included H.K. Peach, Arbor, and PNC. This proceeding also involved claims of failure to pay rent on the part of PNC and failure to make partnership contributions by H.K. Peach.

For reasons similar to those described above as to the $770, we conclude that the Lincoln Sav. & Loan Association test has been met as to the $90,392. Our analysis of the origin of the claim test here is also similar to that of the fees relating to Oakland 3. We find that in Oakland 1, petitioner's position originated from his desire to negate the claims of breach of fiduciary duty and diversion of fees. In addition, he counterclaimed against Pomeroy under the same theories.

Regardless of the success of those claims, petitioner did not seek to create a separate or distinct asset, produce a significant future benefit, or acquire a capital asset. Again, to the extent a benefit inured to petitioner by virtue of defending and counterclaiming in this lawsuit, it appears to us more immediate than future, in that an imminent harm to petitioner would ensue if he failed to defend himself in this proceeding.

Examination of the fees incurred in Oakland 2 yields the same result. Those fees were (1) paid or incurred during 1995, (2) incurred in connection with carrying on petitioner's trade or business, (3) an expense, (4) a necessary expense in that petitioner's participation in the lawsuit was mandated by virtue of claims brought against him, and (5) an ordinary expense in that businessmen such as petitioner, who are actively and closely involved in a trade or business, are subject to litigation and to incurring the associated expenses. As for the origin of the claim in Oakland 2, we do not find the claim to have sought to create a separate or distinct asset, produce a significant future benefit, or acquire a capital asset.

Again, respondent argues that the similarity of these claims to those in Lin v. Commissioner, supra, dictates the conclusion that the fees at issue in Oakland 1 and Oakland 2 must be capitalized. We disagree. Just as we observed with respect to

the Oakland 3 proceeding, neither Oakland 1 nor Oakland 2 involved a dispute as to the validity of ownership interests, or involved a claim to set aside a fraudulent conveyance, as in <u>Lin</u> where the Court concluded that the origin of the claim was to protect, defend, or restore the taxpayers' interest in the stock of the corporations or in other property. Instead, the claims in the proceedings at issue can best be characterized as breach of contract claims. The legal expenses incurred by petitioner to defend against such claims constitute an ordinary and necessary expense of conducting petitioner's trade or business. The proceedings in which he incurred those expenses did not relate to protecting, defending, or restoring petitioner's interests in the companies he owned.

Respondent also notes that Oakland 2 involved a claim for failure to make partnership contributions. Citing section 741 and <u>Commissioner v. Shapiro</u>, 125 F.2d 532 (6th Cir. 1942), affg. a Memorandum Opinion of the Board of Tax Appeals, which allegedly treat a partnership interest as a capital asset, respondent concludes that the legal expenses in Oakland 2 must be capitalized to the extent that they related to an issue of partnership contribution in that they created or enhanced a capital asset. Respondent's references to section 741 and <u>Shapiro</u> are misplaced. Both authorities deem a partnership interest a capital asset solely for disposition purposes. By

contrast, the issue of disposition does not arise in Oakland 2. Therefore, we disagree that on that basis, petitioner must capitalize these expenses. We hold that they are deductible under section 162(a), just like the other legal fees incurred by virtue of Oakland 2.

The last segment of the legal expenses at issue pertains to 1996. That amount ($57,799) was incurred during that year by petitioner in connection with Oakland 1, Oakland 2, Oakland 3, Oakland 4, and Oakland 5. As we have already discussed the deductibility of the litigation expenses relating to the first three proceedings and find the reasoning equally applicable here, we focus our analysis on the fees relating to Oakland 4 and Oakland 5.

Petitioner brought the Oakland 4 suit individually and as a shareholder of REH1. The suit included claims for breach of fiduciary duty by Pomeroy and others, by virtue of their managing the affairs of REH1 to the exclusion of petitioner and to the possible detriment to REH1. Petitioner sought the appointment of a receiver for REH1 and damages for failure to account for and distribute corporate profits to petitioner and REH1.

In Oakland 5, petitioner was forced to defend against Pomeroy and others who were trying to compel the surrender of his interest in TROY-SAK pursuant to the terms of the TROY-SAK partnership agreement. In response to petitioner's earlier

action for dissolution of TROY-SAK and motion for preliminary injunction to arrest the development of this proceeding, the plaintiffs in Oakland 5 sought a court order compelling petitioner to transfer his partnership interest in TROY-SAK to them, so as to achieve the termination of the partnership on their terms.

Under the Lincoln Sav. & Loan Association test, the fees in Oakland 4 were (1) paid or incurred during 1996, (2) incurred in connection with carrying on petitioner's trade or business, (3) an expense, (4) a necessary expense in that petitioner was fulfilling his fiduciary duty by bringing the lawsuit, and (5) an ordinary expense in that breaches of fiduciary duty are not uncommon in business affairs. Furthermore, the claims in this proceeding did not have as their origin the creation of a separate or distinct asset, production of a significant future benefit, or an acquisition of a capital asset. Petitioner instead sought to enforce the fulfillment of the fiduciary duty owed to REH1 by Pomeroy and others. We conclude that the fees relating to Oakland 4 are deductible under section 162(a).

Further, we find the fees relating to Oakland 5 to have been (1) paid or incurred during 1996, (2) incurred in connection with carrying on petitioner's trade or business of developing real estate as they relate to his involvement with TROY-SAK, (3) an expense, (4) a necessary expense in that petitioner was required

to defend himself in a lawsuit, and (5) an ordinary expense in that souring of business relationships between the partners is a routine business reality. See <u>Commissioner v. Lincoln Sav. & Loan Association</u>, 403 U.S. 345 (1971). Under these standards, we find petitioner's expenses incurred in connection with Oakland 5 deductible because he did not seek to create a separate or distinct asset, produce a significant future benefit, or acquire a capital asset in that proceeding. Instead, he was defending his position as a partner with respect to the contractual obligations specified in the partnership agreement.

In view of the above, we hold that petitioner may deduct the legal fees in the amounts of $770 and $90,392 for 1995 and $57,799 for 1996.

V. Office Expenses

For 1995, petitioner deducted $14,065 of office expenses as expenses paid in carrying on his trade or business. Petitioner and some of the Arbor employees worked in the office. Evidence in the record supports the conclusion that Arbor was an "umbrella" entity organized to develop and manage industrial real estate and nursing homes owned by petitioner and his co-venturers. The office in question was used by petitioner to house Arbor's intended business activities. The expenses at issue are those of Arbor, not those of petitioner. Thus, he cannot deduct the fees at issue under section 162.

Nor do we find any evidence of payment of rent by Arbor to petitioner, so as to justify writing off the office expenses by him personally, in his capacity as a landlord, under section 212. Sec. 1.212-1(h), Income Tax Regs. (second sentence). As enunciated by the Supreme Court, the "doctrine of corporate entity" fills a useful purpose in business life, and whether the purpose be to gain an advantage under law of the State of incorporation, so long as that purpose is the equivalent of business activity, the corporation remains a separate taxable entity. Moline Props., Inc. v. Commissioner, 319 U.S. 436, 438 (1943).

Short of disregarding the corporate integrity of Arbor for petitioner's benefit, we see no basis for allowing petitioner to personally expense Arbor's office costs. We hold that the $14,065 of office expenses may not be deducted by petitioner.

We have considered all arguments of the parties related to our holdings set forth herein and, to the extent not discussed herein, find those arguments to be irrelevant or without merit.

Decision will be entered

under Rule 155.